ASSOCIATED BUILDERS AND CON-
TRACTORS OF MASSACHU-
SETTS/RHODE ISLAND, INC., et al.,
Plaintiffs, Appellants,

v.

The MASSACHUSETTS WATER
RESOURCES AUTHORITY, et
al., Defendants, Appellees.

No. 90–1392.

United States Court of Appeals,
First Circuit.

May 15, 1991.

Rehearing Granted Jan. 3, 1991.

Maurice Baskin, with whom Carol Chandler, Mary L. Marshall, Stoneman, Chandler & Miller, Thomas J. Madden and Venable, Baetjer, Howard & Civiletti, were on briefs for appellants.

Richard D. Wayne and Hinckley, Allen, Snyder & Comen, were on brief for Utility Contractors Ass'n of New England, Inc., amicus curiae.

Ralph F. Abbott, Jr., Jay M. Presser and Skoler, Abbott & Presser, P.C., were on brief for National Ass'n of Mfrs., amicus curiae.

James J. Kelley and John M. Stevens, with whom E. Carl Uehlein, Jr., Morgan, Lewis & Bockius, Arthur G. Telegen, Foley Hoag & Eliot, Catherine L. Farrell, Gen. Counsel and Virginia S. Renick, Sr. Staff Counsel, were on joint brief for appellees Kaiser Engineers, Inc. and Massachusetts Water Resources Authority.

Donald J. Siegel, with whom Mary T. Sullivan, Segal, Roitman & Coleman, Laurence J. Cohen, Victoria L. Bor, Sherman, Dunn, Cohen, Leifer & Yellig, Walter Kamiat and Laurence Gold, were on briefs for appellee Building and Const. Trades Council of the Metropolitan Dist.

Scott Harshbarger, Atty. Gen. and Douglas H. Wilkins, Asst. Atty. Gen., were on supplemental brief for the Com. of Mass., amicus curiae.

Bond, Schoeneck & King, Sherburne, Powers & Needham, Raymond W. Murray, Robert W. Kopp and Anthony E. Battelle, were on brief for Bechtel Corporation/Parsons Brinckerhoff, Quade & Douglas, Inc., a Joint Venture, amicus curiae.

Before BREYER, Chief Judge, and CAMPBELL, TORRUELLA, SELYA and CYR, Circuit Judges.

## OPINION EN BANC

TORRUELLA, Circuit Judge.

Plaintiffs–Appellants Associated Builders and Contractors of Massachusetts/Rhode Island, Inc. ("ABC")[1] appeal the decision of the United States District Court for the District of Massachusetts denying ABC's request for a preliminary injunction. For the reasons stated below, we reverse this decision and remand for action consistent with our opinion.

## I. THE FACTS

The Massachusetts Water Resources Authority ("MWRA") is a governmental agency authorized by the Massachusetts legislature to provide water supply services, sewage collection, and treatment and disposal

---

**1.** Also its national association and five individual contractors.

services for the eastern half of Massachusetts. Following a lawsuit arising out of its failure to prevent the pollution of Boston Harbor, *United States v. Metropolitan District Commission*, C.A. No. 85–0489–MA (Mazzone, J.), the MWRA was ordered to meet a detailed timetable to carry out the clean-up of that body of water. This task, known as the Boston Harbor Clean–Up Project ("Project"), is estimated to involve $6.1 billion of public works over a ten year period. The means and methods of carrying out the Project are set forth in the MWRA's enabling statute, Mass.Gen.Laws ch. 92, App. §§ 1–1, *et seq.*, and the Commonwealth's public bidding laws. Mass. Gen.Laws ch. 149, §§ 44A–44I and ch. 30, § 39M. Pursuant to these laws, the MWRA provides the funds for construction (assisted by state and federal grants), owns the property to be built, establishes all bid conditions, decides all contract awards, pays the contractors, and generally exercises control and supervision over all aspects of this project.

In the spring of 1988, the MWRA retained Kaiser Engineers, Inc. ("Kaiser") as its program/construction manager. Kaiser's primary function is to manage and supervise the ongoing construction activity. In the course of performing its function, however, Kaiser could be expected to employ craft labor in certain situations. Its agreement with the MWRA permits it to act as an execution contractor, or to perform certain direct hire work as needed in cases of default or incomplete performance by other contractors, clean-up work and other limited or emergency situations.

Another important function of Kaiser is to advise the MWRA on the development of a labor relations policy which will maintain worksite harmony, labor-management peace, and overall stability during the ten-year life of the Project. The MWRA had already experienced work stoppages and informational picketing at various sites [2] and was concerned that, because of the scale of the Project and the number of different craft skills involved, it was vulnerable to numerous delays thus placing the court-ordered schedule in jeopardy and subjecting the MWRA to possible contempt orders. This concern was enhanced by the geographic location of the existing and proposed treatment facilities which makes them vulnerable to picketing and other concerted activity.[3]

The above circumstances led Kaiser to recommend to the MWRA that it be permitted to negotiate with the building and construction trades unions, through the Building and Construction Trades Council and affiliated labor organizations [4] ("Trades Council"), in an effort to arrive at an agreement which would assure labor stability over the life of the Project. Any agreement would be subject to review and final approval by the MWRA.

The MWRA accepted Kaiser's recommendations and in early May 1989 Kaiser proceeded to meet with negotiating teams from the unions, including the Trades Council. The Master Labor Agreement was the result of their negotiations. After review by the MWRA staff, and upon its recommendation, the MWRA Board of Directors on May 28, 1989 adopted the Master Labor Agreement as the labor policy for the Project and directed that Specification 13.1 be added to the bid specification for all new construction work. Specification 13.1 provides that:

> [E]ach successful bidder and any and all levels of subcontractors, as a condition of

---

**2.** In November of 1988, two labor unions picketed the Project and precipitated a brief work stoppage, which was ended by establishment of separate entrances to the job site. This is a well recognized method of maintaining continuity of work in the construction industry. Other threats were made to disrupt the work, but no other significant disruption actually occurred.

**3.** At Deer Island access to the site was by a single two-lane road passing through crowded Winthrop streets, and next to the existing Suffolk County House of Correction. Access to the facility at Nut Island is similarly constrained. Facilities being built off-island to transport workers, construction materials and equipment across the harbor to Deer Island would have to be designed or adapted to the potential for labor unrest with unions other than member unions of the Trades Council such as those representing maritime workers.

**4.** Thirty-four in all.

being awarded a contract or subcontract, will agree to abide by the provisions of the Boston Harbor Wastewater Treatment Facilities Project Labor Agreement ["the Master Labor Agreement"] as executed and effective May 22, 1989, by and between [Kaiser], on behalf of [MWRA], and the [Trades Council] ... and will be bound by the provisions of that agreement in the same manner as any other provision of the contract. A copy of the agreement is attached and included as part of these Contract Documents ...

The Master Labor Agreement establishes as "the policy of the [MWRA] that the construction work covered by this Agreement shall be contracted to Contractors who agree to execute and be bound by the terms of this Agreement." It is the duty of Kaiser on behalf of MWRA to "monitor compliance with this Agreement by all Contractors who through their execution of this Agreement, together with their subcontractors, have become bound hereto." The parties state the need to meet the "specified and limited time frames" established by the district court's order in the Boston Harbor Clean-up case. Also agreed to are binding methods for the settlement of "all misunderstandings, disputes or grievances which may arise [and] ... the Union, agree[s] not to engage in any strike, slowdown or interruption of work [or] the [employers] ... to engage in any lockout."

Most importantly, the Trades Council is recognized "as the sole and exclusive bargaining representative of all craft employees," and its hiring halls are made the initial and principal source for the Project's labor force. All employees are subject to the union security provisions of the agreement which require that they become union members within seven days of their employment. Employees may seek redress for their grievances only through the recognized labor organizations, and the contractors are bound by the Trades Council member unions' wage and benefit provisions and apprenticeship program. The contractors are required to make contributions to various union benefit trust funds and to observe the unions' work rules and job classifications.

The Master Labor Agreement became "effective [on] May 22, 1989, and shall continue in effect for the duration of the Project construction work." As previously indicated, the Project is expected to take ten years to complete.

## II.  PROCEDURAL BACKGROUND

ABC is an organization composed of individual construction contractors and trade associations representing over 18,000 "merit shop" (i.e., non-union) construction industry employers. On March 5, 1990, ABC brought suit in the United States District Court for the District of Massachusetts against the MWRA, Kaiser and the Trades Council, seeking injunctive relief against enforcement of bidding Specification 13.1. ABC claims that, as applied to its membership, Specification 13.1 effectively bars them from seeking and obtaining any bids in this multi-billion dollar, ten-year endeavor. ABC alleges irreparable injury and damages from what it perceives to be a violation of various federal and state statutes. These contentions, and the district court's treatment of them, can be summarized as follows:

(1) *Preemption under the NLRA.* ABC alleged that the National Labor Relations Act ("NLRA" or "Act"), 29 U.S.C. § 151 *et seq.*, prohibits the MWRA from interfering with the labor negotiations process, specifically arguing that requiring employers to accept the terms of a collective bargaining agreement with a union that has not been designated as the bargaining agent by employees is illegal. The district court held that Section 8(e) and (f) of the NLRA[5] permit such restrictive agreements in the construction industry and that even if the Master Labor Agreement were to affect NLRA–regulated conduct, such impact must be considered against the manifest importance of the Boston Harbor clean-up. "The presence of *non-represented* employees simply increases the potential for continuous strife and crippling work stoppag-

5.  29 U.S.C. §§ 158(e) and (f).

es." The court ruled that the Master Labor Agreement was lawful under the circumstances.

(2) *Preemption under ERISA.* ABC claimed that since the Agreement required employers to contribute to trust funds, the Agreement in effect regulated the terms and conditions of employee benefit plans covered under Section 514(c) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1144(c). The court disagreed, holding that the Agreement is not so broad and only applies to a single discrete project and thus does not contravene ERISA.

(3) *Equal protection and due process clause allegations.* ABC claimed that the bidding procedures discriminate against non-union contractors and effectively preclude such contractors from bidding, thus violating the equal protection and due process clauses. These claims were also rejected by the district court, which ruled that non-union contractors are not a protected class, that bidding procedures were open to all contractors, and that since ABC had failed to make any bid as of yet, a constitutionally protected right was lacking.[6]

(4) *The Sherman Act claim.* ABC alleged that the Master Labor Agreement and Specification 13.1 constitute a conspiracy among appellees to reduce competition in the construction industry by effectively precluding non-union contractors, in violation of the Sherman Act, 15 U.S.C. § 1. Below, the court reiterated that appellants were not excluded from the bidding process and furthermore, since the Master Labor Agreement "serves legitimate business, and public purposes" there was no anti-trust violation. Moreover, the district court found that the MWRA, as a state entity, is immune from an anti-trust claim and that Section 8(e) of the NLRA along with labor's non-statutory anti-trust exemption under the Sherman Act protect Kaiser and the Trades Council as well.

(5) *State law claims.* The district court rejected ABC's state law violations claim, ruling that the Massachusetts Public Bid-

ding statute, Mass.Gen.Laws ch. 30, § 39M and ch. 149, §§ 44A–I, specifically required that the winning bidder must furnish labor that can work in "harmony with all the other elements of labor employed or to be employed on the work." It further ruled that there was no interference with business relationships because no relationships existed as of yet.

Thus, the district court denied a preliminary injunction holding that, first, the appellants were not likely to succeed on the merits. Second, ABC had not shown immediate and irreparable harm because it had not been awarded a contract; even if it had, it would have an adequate remedy at law. Third, the balance of harm to the appellants was outweighed by the harm to the appellees, since the appellees would suffer intolerable delays, disruptions, and increased costs in the Boston Harbor cleanup without Specification 13.1. And last, issuing an injunction would adversely affect the public interest in the swift clean-up of Boston Harbor.

ABC appealed the denial of the preliminary injunction to a panel of this court. In its opinion, the original panel reached only the issue of preemption under the NLRA, finding (as do we) that issue dispositive of the appeal. In its petition for rehearing *en banc*, the Trades Council raised a new point relevant to NLRA preemption: whether Specification 13.1 should escape preemption because it was necessary to efficient completion of the clean-up. The Trades Council, joined by the MWRA and various amici in their briefs on rehearing, maintain that because the Specification was enacted to further proprietary, rather than regulatory, interests, it falls within an exception to the preemption doctrine allegedly articulated by the Supreme Court in *Wisconsin Dep't of Indus. v. Gould*, 475 U.S. 282, 106 S.Ct. 1057, 89 L.Ed.2d 223 (1986). We determined that this issue merited closer scrutiny by the court as a whole, and issued an order requesting the parties to address the following issues:

**6.** Analogous state claims were also rejected.

Is the MWRA's insistence upon the labor conditions at issue reasonably related to an important proprietary interest of the state, a legitimate response to state procurement restraints, or a legitimate response to local economic needs?

If so, is that insistence therefore lawful, *Wisconsin Dep't of Industry v. Gould*, 475 U.S. 282, 291 [106 S.Ct. 1057, 1063, 89 L.Ed.2d 223] (1986) and *Golden State Transit Corp. v. City of Los Angeles*, 475 U.S. 608 [106 S.Ct. 1395, 89 L.Ed.2d 616] (1986), being distinguishable in this respect?

## III. STANDARD OF REVIEW

■■■ On review, we will reverse the district court's denial of a preliminary injunction where the denial is an abuse of discretion, or is based upon a clear error of law, or where the district court's findings of fact are clearly erroneous. *See, e.g., Massachusetts Ass'n of Older Americans v. Sharp*, 700 F.2d 749, 751–52 (1st Cir. 1983); *Maceira v. Pagan*, 649 F.2d 8, 15 (1st Cir.1981); *see also General Electric Co. v. New York State Dept. of Labor*, 891 F.2d 25, 26 (2d Cir.1989) (reversing denial of preliminary injunction on ERISA preemption grounds); 7 Moore, *Federal Practice and Procedure* ¶ 65.04[2] (2d ed. 1987). Where, as here, appellants are asking for a mandatory injunction which will change the *status quo ante* during the pendency of litigation, we will take into account the exigencies and circumstances of the situation. *See Massachusetts Coalition of Citizens with Disabilities v. Civil Defense Agency*, 649 F.2d 71, 76 n. 7 (1st Cir.1981).

■■ To be entitled to injunctive relief a party must establish that it has a likelihood of success on the merits, that it will suffer immediate and irreparable harm if relief is not granted, that such harm outweighs any harm to the non-moving party, and that the public interest will not be adversely affected. *Planned Parenthood v. Bellotti*, 641

F.2d 1006, 1009 (1st Cir.1981); *Lancer v. Lebanon Housing Authority*, 760 F.2d 361, 362 (1st Cir.1985). The balancing of interests shifts in plaintiffs' favor when a strong likelihood of success on the merits is shown. *SEC v. World Radio Mission, Inc.*, 544 F.2d 535, 541–42 (1st Cir.1976).

## IV. DISCUSSION

In our opinion, appellants have made a strong showing that they are likely to succeed on the merits. In so holding, we do not reach their entire array of arguments, because in our view, their main argument ultimately carries the day.

### A. *Preemption under the NLRA*

In order to analyze preemption under the NLRA, we must first examine a bit of the Act's evolution. Since first enacted in 1935, the NLRA "has empowered the National Labor Relations Board 'to prevent any person from engaging in any unfair labor practice ... [defined by the Act] affecting commerce.'" 29 U.S.C. § 160(a). "By this language, and by the definition of 'affecting commerce' ... Congress meant to reach to the full extent of its power under the Commerce Clause." *Guss v. Utah Labor Relations Board*, 353 U.S. 1, 3, 77 S.Ct. 598, 599, 1 L.Ed.2d 601 (1957). *See also* 29 U.S.C. § 152(7).[7] Thus, in the area of labor relations there is "not only a general intent to pre-empt the field but also ... [the] inescapable implication of exclusiveness." *Guss*, 353 U.S. at 10, 77 S.Ct. at 602. In *Guss* the Supreme Court went so far as to carry that principle to the point of creating a no-man's land, in which no jurisdiction existed on behalf of state authorities to intervene in labor relations matters covered by the Act notwithstanding the Board's refusal to exercise dominion over such disputes. It should be noted that, although *Guss* involved unfair labor practices, the Act uses substantially similar language regarding the representation procedures established thereunder, and there-

7. 29 U.S.C. § 152(7):
   The term "affecting commerce" means in commerce, or burdening or obstructing commerce or the free flow of commerce, or having led or tending to lead to a labor dispute

burdening or obstructing commerce or the free flow of commerce.
*See also NLRB v. Bradford Dyeing Ass'n*, 310 U.S. 318, 325–26, 60 S.Ct. 918, 922, 84 L.Ed. 1226 (1940) (construing "affecting commerce").

fore the principle established by *Guss* is of equal application to representation matters.[8]

The situation created by *Guss* led in 1959 to the amendment by Congress of Section 14 of the Act, allowing for state intervention in labor disputes affecting commerce in which the Board has specifically declined to exercise jurisdiction.[9] Prior to that amendment, as is discussed in *Guss*, 353 U.S. at 6–7, 77 S.Ct. at 600–01, a state could only intervene in a labor dispute affecting commerce if the Board had entered into a cession agreement pursuant to Section 10(a) of the Act,[10] and then only if the state statute was consistent with a corresponding provision in the Act.

Intervention in labor matters affecting commerce today is thus limited to cession agreements by the Board with the states under Section 10(a) of the Act, or specific declinations by the Board to intervene pursuant to Section 14(c) of the Act. There is

a third category, also under Section 14 of the Act,[11] which allows the states to legislate to prohibit union shop agreements.

■■ It is a textbook proposition that, under the supremacy clause of Article VI of the Constitution,[12] the "supreme" congressional law supersedes or preempts state law. Preemption occurs not only when there is an outright conflict between the federal scheme and the state requirement, but also when congressional action is an implicit barrier—*e.g.*, when state regulation interferes unduly with the accomplishment of congressional objectives. Congressional legislation in an area in which a state seeks to regulate does not necessarily preclude all state action. Nor does the fact that there is no explicit federal-state conflict or congressional statement of intent to bar state authority inescapably rule out a finding of preemption. *Cf. Guss*, 353 U.S. at 10, 77 S.Ct. at 602.

---

**8.** *See* 29 U.S.C. §§ 141(b), 151, 152, 157, 159. For example, § 159(c)(1) provides that:

Whenever a petition shall have been filed ... the Board shall investigate such petition and if it has reasonable cause to believe that a question of representation *affecting commerce* exists shall provide for an appropriate hearing upon due notice ... (emphasis supplied).

**9.** 29 U.S.C. § 164:

(c)(1) The Board, in its discretion, may, by rule of decision or by published rules adopted pursuant to subchapter II of chapter 5 of Title 5, decline to assert jurisdiction over any labor dispute involving any class or category of employers, where, in the opinion of the Board, the effect of such labor dispute on commerce is not sufficiently substantial to warrant the exercise of its jurisdiction: *Provided,* That the Board shall not decline to assert jurisdiction under the standards prevailing upon August 1, 1959.

(2) Nothing in this subchapter shall be deemed to prevent or bar any agency or the courts of any State or Territory (including the Commonwealth of Puerto Rico, Guam, and the Virgin Islands), from assuming and asserting jurisdiction over labor disputes over which the Board declines, pursuant to paragraph (1) of this subsection, to assert jurisdiction.

**10.** 29 U.S.C. § 160(a):

The Board is empowered, as hereinafter provided, to prevent any person from engaging in any unfair labor practice (listed in section 158 of this title) affecting commerce. This power shall not be affected by any other

means of adjustment or prevention that has been or may be established by agreement, law, or otherwise: *Provided,* That the Board is empowered by agreement with any agency of any State or Territory to cede to such agency jurisdiction over any cases in any industry (other than mining, manufacturing, communications, and transportation except where predominantly local in character) even though such cases may involve labor disputes affecting commerce, unless the provision of the State or Territorial statute applicable to the determination of such cases by such agency is inconsistent with the corresponding provision of this subchapter or has received a construction inconsistent therewith.

**11.** 29 U.S.C. § 164(b):

Nothing in this subchapter shall be construed as authorizing the execution or application of agreements requiring membership in a labor organization as a condition of employment in any State or Territory in which such execution or application is prohibited by State or Territorial law.

**12.** U.S. Const. art. VI, cl. 2:

This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

The question in each case is what the purpose of Congress was [in legislating] ... Such a purpose may be evidenced in several ways. The scheme of federal regulation may be so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it. Or the Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject. Likewise, the object sought to be obtained by the federal law and the character of obligations imposed by it may reveal the same purpose. Or the state policy may produce a result inconsistent with the objective of the federal statute. It is often a perplexing question whether Congress has precluded state action or by the choice of selective regulatory measures has left the police power of the States undisturbed except as the state and federal regulations collide.

*Rice v. Santa Fé Elevator Corp.*, 331 U.S. 218, 230–31, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947) (citations omitted).[13]

The Supreme Court has recognized two types of federal preemption of state and local government action in the field of labor law. First, the Supreme Court has prohibited the states from regulating activities "which are protected by Section 7 of the National Labor Relations Act, or constitute an unfair labor practice under Section 8." *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 244, 79 S.Ct. 773, 779, 3 L.Ed.2d 775 (1959). Second, the Court has held that state and local governments are prohibited from regulating activities which Congress intended to be left unrestricted by any governmental power. *Lodge 76, Int'l Assoc. of Machinists & Aerospace Workers v. Wisconsin Emp. Comm.*, 427

U.S. 132, 140, 96 S.Ct. 2548, 2553, 49 L.Ed.2d 396 (1976).[14]

While both forms of preemption are implicated by this appeal, we believe that the present case is most heavily influenced by the Supreme Court's holdings in the *Golden State Transit Corp.* cases, which relied and expanded upon the *Machinists* doctrine. *See Golden State Transit Corp. v. City of Los Angeles*, 475 U.S. 608, 106 S.Ct. 1395, 89 L.Ed.2d 616 (1986) [*Golden State I*]; *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989) [*Golden State II*]. While there are differences between the *Golden State* cases and the present case, we think the similarities have greater salience.

In *Golden State I* the employer sought renewal of a taxicab operating license from the City of Los Angeles. At the time the employer was engaged in a labor dispute with the union that represented its employees. The City Council conditioned renewal of the franchise on settlement of the labor dispute by a specific date. When the strike was not settled by that date, the franchise expired. The Supreme Court ruled that the city's action in conditioning renewal of the franchise on settlement of the labor dispute was preempted by the Act. The Court stated, in language which we believe is adaptable to the present controversy:

Although the labor-management relationship is structured by the NLRA, certain areas intentionally have been left " 'to be controlled by the free play of economic forces.' " ... States are therefore prohibited from imposing additional restrictions on economic weapons of self-help, ... unless such restrictions presumably were contemplated by Congress.... "[T]he crucial inquiry regarding pre-emption is the same: whether 'the exercise of plenary state authority to curtail or

---

**13.** The dissent's definition of preemption, *see* Op. at 360 (Breyer, C.J., dissenting), although correct as far as it goes, is unduly restrictive. Omitted is any mention of preemption "where the pervasiveness of the federal regulation precludes supplementation by the States, [or] where the federal interest in the field is sufficiently dominant." *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 300, 108 S.Ct. 1145, 1150,

99 L.Ed.2d 316 (1988); *French v. Pan Am Express, Inc.*, 869 F.2d 1, 2 (1st Cir.1989).

**14.** In *Machinists*, the Court had found unlawful a state commission's prohibition against union refusals to work overtime during collective bargaining negotiations. 427 U.S. at 148–49, 96 S.Ct. at 2557.

entirely prohibit self-help would frustrate effective implementation of the Act's processes.' "

*Golden State I*, 475 U.S. at 614–15, 106 S.Ct. at 1398–99 (citations omitted). The city's insistence on a settlement was preempted by the Act because it " 'entered into the substantive aspects of the bargaining process to an extent Congress has not countenanced.' " *Id.* at 615–16, 106 S.Ct. at 1399 (citations omitted). This was so because "[t]he NLRA requires an employer and a union to bargain in good faith, but it does not require them to reach agreement." *Id.* at 616, 106 S.Ct. at 1399.

In *Golden State II*, where the issue involved the availability of compensatory damages, the Supreme Court reiterated with even greater firmness the NLRA's subordination of state interests to the principle of unfettered collective bargaining. The Court declared that the *Machinists* rule—shielding the collective bargaining process from government interference—was not designed "to answer the question whether federal or state regulations should apply to certain conduct. Rather, it is more akin to a rule that denies *either* sovereign the authority to abridge a personal liberty." *Golden State II*, 110 S.Ct. at 451–52 (emphasis added). The Court concluded that the *Machinists* preemption rule "is a guarantee of freedom for private conduct that the state may not abridge." *Id.* at 452.

▮ In the present case, the state's intrusion into the bargaining process is pervasive. The state not only mandates that a labor agreement be reached before a bid is awarded, but dictates with whom that agreement is going to be entered, and specifies what its contents shall be. For all intents and purposes the state here *eliminates* the bargaining process altogether. Inasmuch as regulation of this conduct [15] seems central to federal labor relations, we do not see how it could be considered peripheral under the *Garmon* analysis. *Gar-*

*mon,* 359 U.S. at 243, 79 S.Ct. at 778. *Compare Belknap, Inc. v. Hale*, 463 U.S. 491, 509, 103 S.Ct. 3172, 3182, 77 L.Ed.2d 798 (1983) (third parties hired as strike replacements had state-law causes of action based on misrepresentations by the employer); *Automobile Workers v. Russell*, 356 U.S. 634, 635, 78 S.Ct. 932, 933, 2 L.Ed.2d 1030 (1958) (state court jurisdiction over common law tort action against union for mass picketing upheld); *Youngdahl v. Rainfair*, 355 U.S. 131, 132, 78 S.Ct. 206, 208, 2 L.Ed.2d 151 (1957) (same re injunctive power to prevent interference with free use of streets); *Automobile Workers v. Wisconsin Emp. Rel. Board*, 351 U.S. 266, 274, 76 S.Ct. 794, 799, 100 L.Ed. 1162 (1956) (same re power to enjoin violent union conduct); *United Constr. Workers v. Laburnum Constr. Corp.*, 347 U.S. 656, 657, 74 S.Ct. 833, 834, 98 L.Ed. 1025 (1954) (state may exercise its historic powers over such traditionally local matters as public safety and order and the use of streets and highways); *Allen–Bradley Local v. Wisconsin Emp. Rel. Board*, 315 U.S. 740, 749, 62 S.Ct. 820, 825, 86 L.Ed. 1154 (1942) (same).

To be sure, there may be instances where the "regulated conduct touch[es] interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, [a court] could not infer that Congress had deprived the States of the power to act." *Garmon*, 359 U.S. at 244, 79 S.Ct. at 779. The district judge, in a commendable attempt to harmonize the irreconcilable conflicts presented by this difficult case, reasoned that even if the Master Labor Agreement "were to have some impact on NLRA-regulated conduct, that impact must be considered in the light of important state interest, namely the scheduled and court-ordered completion of the harbor clean-up expeditiously and without unnecessary expense." In effect, the court held that this public purpose sani-

---

15. The fact that the state here has acted through its bidding regulations rather than its general law is irrelevant to our analysis, as "judicial concern has necessarily focused on the nature of the activities which the States have sought to

regulate, rather than on the method of regulation adopted." *Golden State I*, 475 U.S. at 614 n. 5, 106 S.Ct. at 1398 n. 5 (quoting *Garmon*, 359 U.S. at 243, 79 S.Ct. at 778).

tized its constitutional shortfalls. While we do not totally fault the court's efforts in this respect, nor disagree as to the importance of the Boston Harbor clean-up, it cannot be said that congressional concern for a uniform, national labor policy as embodied in the NLRA, is entitled to secondary deference. Importantly, the regulated conduct here is the labor relations/bargaining process itself. Such processes have been termed by Congress as paramount to national, not local, interests. We, ourselves, have recognized as much. *See General Electric Co. v. Callahan*, 294 F.2d 60, 67 (1st Cir.1961) (holding that a state labor board's interference with a labor contract negotiation "conflict[ed] with the national policy of free and unfettered collective bargaining"), *cert. dismissed*, 369 U.S. 832, 82 S.Ct. 851, 7 L.Ed.2d 840 (1962). Moreover, in at least one respect, Specification 13.1 seems not to further, but rather to trample, what the Massachusetts legislature has determined to be the Commonwealth's interest. Massachusetts has enacted a Fair Competitive Bid Law which requires that the Commonwealth obtain through open competition the lowest responsible and eligible bid for public construction projects. Mass.Gen.Laws ch. 30, § 39M, and ch. 149, §§ 44A–I. Although we do not reach the state law arguments raised by ABC, we do note that this apparent conflict undercuts the MWRA's position that Specification 13.1 furthers peculiarly local interests.

There are few areas in which local interest can be more legitimately exercised than in protecting the public from financial hardship caused by fiscally irresponsible persons using the state highways. Yet the Supreme Court invalidated a state statute whose purpose was resolution of such a dilemma because it concluded that it conflicted with the Federal Bankruptcy Act. *Pérez v. Campbell*, 402 U.S. 637, 656, 91 S.Ct. 1704, 1714, 29 L.Ed.2d 233 (1971). The Court rejected the argument that the purpose of the state law, rather than its effect on the operation of federal legisla-

tion, should govern its validity. Even if the state claimed to be concerned with promotion of highway safety, such a statute could not stand if it conflicted with the federal scheme: "[S]uch a doctrine would enable state legislatures to nullify nearly all unwanted federal legislation by simply publishing a legislative committee report articulating some state interest or policy—other than frustration of the federal objective—that would be tangentially furthered by the proposed state law." *Id.* at 652, 91 S.Ct. at 1712.

Although the local concerns that led to the promulgation of Specification 13.1—"labor harmony during [the] life ... [of] ... this critical project"—are laudable, they conflict with paramount federal law and must therefore fall. We should add that we are in any event somewhat skeptical of the *pax industrial* which the Master Labor Agreement utopically promotes. This peaceable kingdom may be somewhat less than attainable considering that this contract is no bar to rival, or for that matter, anti-union, activity. *See* 29 U.S.C. § 158(f), *last proviso*.

■ Appellees contend that, had the Master Agreement been entered into directly between the state agency and the unions, it would be unassailable, because "[t]he National Labor Relations Act leaves regulation of the labor relations of state and local government to the States." *Abood v. Detroit Bd. of Education*, 431 U.S. 209, 223, 97 S.Ct. 1782, 1793, 52 L.Ed.2d 261 (1977). Of course, if the MWRA were the actual employer of the Project laborers, the NLRA would be totally inapplicable as States are excluded from the definition of "employer." 29 U.S.C. § 152(2).[16] The state's substantial participation in the Project, however, is not enough to alter its status from regulator to employer, nor does any party seriously claim such a relationship. There are insufficient indicia of an employer/employee relationship between the MWRA and the la-

---

**16.** 29 U.S.C. § 152(2) states in part:
The term 'employer' includes any person acting as an agent of an employer, directly or indirectly, but shall not include the United States or any wholly owned Government corporation, or any Federal Reserve Bank, or any State or political subdivision thereof ...

borers.[17]  Rather, the state is in its common role of a third party purchaser.  If the state employer exclusion from the NLRA were interpreted to include all situations in which a state contracted for goods or services, the exception would likely swallow the rule.[18]  Allowing a state to impose restrictions upon *all* companies from which it purchases goods or services would effectively permit it to regulate labor relations between private employers and their employees thus totally displacing the NLRA, not just in this Project, but also statewide, and, if the practice were to become generalized, nationally.  Indeed, an anti-union state government could allow only non-union employers to bid on state projects, if the state-as-employer argument is taken to its extreme.

As discussed herein, a state is not included in the definition of employer.  Normally, employers cannot enter into pre-hire agreements.  Congress created an exception to this prohibition for *employers* in the construction industry, as such term is defined in the Act.  To suggest, as is done by the dissent, *see* p. 364 (Breyer, C.J., dissenting), that a *state*, by definition not an employer within this statute, somehow reverts to the status of statutory employer for purposes of this exception is fancy judicial foot work at its nimblest.  The facts provide a dose of reality that not only undercuts the dissent's

imaginative analysis of the legislative history of the construction industry exceptions, but also destroys its premise that the state should be treated as a private employer.  Indisputably, the MWRA is not an employer under either the law, 29 U.S.C. § 152(2), or the facts of this case.

Thus, absent some principled basis for reading an exception into the legal framework, a matter which we discuss *post*, we believe that either because of its regulation of matters protected by § 7 of the Act (*e.g.*, the mandatory recognition of the Trades Council), *Garmon*, 359 U.S. at 245, 79 S.Ct. at 779, or because of its direct intrusion into the collective bargaining process, *Golden State I*, 475 U.S. at 614–15, 106 S.Ct. at 1398–99, Specification 13.1 frustrates the purposes of the Act and is, therefore, preempted.

B.  *Sections 8(e) and (f) of the Act—The construction industry exemption*

■  Appellees argue, and the district court in effect ruled, that the provision of Sections 8(e) and (f) of the Act validate the Master Labor Agreement "in the context of the unique conditions which exist in the construction industry."

Section 8(e) of the Act[19] makes it an unfair labor practice for an employer and a

---

**17.** The distinction between an employee and an independent contractor under the NLRA is to be determined by application of common law agency principles.  *NLRB v. Amber Delivery Service, Inc.,* 651 F.2d 57, 60 (1st Cir.1981).  Under this standard, the relationship between the construction workers and the MWRA is a contracting, not an employment, relationship.  For example, the MWRA does not have the right to control the laborers' performance, nor does it pay their salaries, provide pension or other benefits, or make FICA payments on their behalf.

**18.** Nevertheless, there may be situations in which a contractual relationship between the state and a private entity is such that the state would be considered an employer for the purposes of the NLRA.  *See, e.g., Board of Trustees of Memorial Hosp. v. NLRB,* 624 F.2d 177 (10th Cir.1980) (holding that where a private employer who has contracted to provide services to an exempt political subdivision does not retain sufficient control over the employment relationship to engage in collective bargaining, the exempt subdivision is deemed the true employer);

*Compton v. National Maritime U. of America,* 533 F.2d 1270 (1st Cir.1976) (noting that a private contractor that performs services for an exempt governmental agency may be deemed to share the exemption).

**19.** 29 U.S.C. § 158(e) states in part:

It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforceable and void: *Provided,* That nothing in this subsection shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construc-

union to enter into what is commonly referred to as a "hot cargo" agreement. Under a "hot cargo" agreement, generally, the employer binds itself not to do business with another employer or person. This type of agreement developed out of situations in which unions did not want their members to be working or handling "struck" goods. Section 8(e), however, contains a limited exemption for the construction industry, "relating to the contracting or subcontracting of work to be done at the site of the construction." Thus "hot cargo" agreements are legal, to this circumscribed extent, in the construction industry.

Section 8(f) of the Act [20] creates another exception for the building and construction industry by allowing certain actions, which would otherwise be prohibited as unfair labor practices, by employers and unions in that line of work. Thus a construction industry employer may enter into a so-called "pre-hire" agreement with a union, *e.g.*, a collective bargaining agreement wherein the union's representative status is immaterial and which in fact is usually entered into prior to the hiring of any employees. Furthermore, such an agreement may contain a union shop provision requiring membership in the union seven days after hiring, 29 U.S.C. § 158(f)(2), which

would otherwise be illegal; [21] a requirement that the employer notify the union of job openings giving the labor organization an opportunity to refer qualified job workers, 29 U.S.C. § 158(f)(3); as well as a condition establishing minimum training or experience qualifications and area-wide seniority. 29 U.S.C. § 158(f)(4).

A construction industry labor contract entered into under the exceptional provisions of Section 8(f) is not, as specifically stated in the final proviso of that section, a bar to a petition for election, be it by a rival union,[22] by the employer[23] or by the employees themselves.[24] If the employees elect a rival union as their bargaining agent, neither the winning union nor the employer are required to assume the 8(f) contract. If the employees reject the 8(f) contracting union as their bargaining agent and do not choose another bargaining agent, the contract is totally void because one of the contracting parties is disqualified.

It is apparent from the above that under the exceptions established by Sections 8(e) and (f) of the Act, the Master Labor Agreement between the Trades Council and Kaiser is a valid labor contract. *See Jim McNeff, Inc. v. Todd*, 461 U.S. 260, 265–66, 103 S.Ct. 1753, 1756, 75 L.Ed.2d 830 (1983).

tion, alteration, painting, or repair of a building, structure, or other work: ...

**20.** 29 U.S.C. § 158(f):

It shall not be an unfair labor practice under subsections (a) and (b) of this section for an employer engaged primarily in the building and construction industry to make an agreement covering employees engaged (or who, upon their employment, will be engaged) in the building and construction industry with a labor organization of which building and construction employees are members (not established, maintained, or assisted by any action defined in subsection (a) of this section as an unfair labor practice) because (1) the majority status of such labor organization has not been established under the provisions of section 159 of this title prior to the making of such agreement, or (2) such agreement requires as a condition of employment, membership in such labor organization after the seventh day following the beginning of such employment or the effective date of the agreement, whichever is later, or (3) such agreement requires the employer to notify such labor organization of opportunities for

employment with such employer, or gives such labor organization an opportunity to refer qualified applicants for such employment, or (4) such agreement specifies minimum training or experience qualifications for employment or provides for priority in opportunities for employment based upon length of service with such employer, in the industry or in the particular geographical area: *Provided,* That nothing in this subsection shall set aside the final proviso to subsection (a)(3) of this section: *Provided further,* That any agreement which would be invalid, but for clause (1) of this subsection, shall not be a bar to a petition filed pursuant to section 159(c) or 159(e) of this title.

**21.** The usual provision is 30 days. *See* 29 U.S.C. § 158(a)(3).

**22.** 29 U.S.C. § 159(c)(1)(A).

**23.** 29 U.S.C. § 159(c)(1)(B).

**24.** 29 U.S.C. § 159(e)(1).

That conclusion, however, is irrelevant to the preemption issue at hand. Appellants do not challenge the validity of that agreement; they contest the legality of Specification 13.1, which establishes recognition of the Trades Council and signing of the Master Labor Agreement as a condition of the award of an MWRA bid. On said issue, Sections 8(e) and (f) have no bearing, except as reinforcement for appellants' preemption arguments. It is clear, both from their nature and history, that Congress extensively debated and considered these controversial provisions before their enactment. *See generally*, 1959 U.S.Code Cong. & Admin.News, p. 2318 *et seq.* It is unlikely that Congress intended to leave open to Balkanization by the states such core areas as unfair labor practices and collective bargaining, which are the matters inescapably arising from Sections 8(e) and (f) problems. Indeed, nowhere in the legislative history is there any indication that a state would be allowed to impose this type of regulation. The history of Sections 8(e) and (f) discusses private employers only; the silence as to permitted state regulation is deafening. In enacting these exceptional provisions, Congress occupied the field to the exclusion of such local regulations as are exemplified by Specification 13.1. *See Guss*, 353 U.S. at 10, 77 S.Ct. at 602. Although the Master Labor Agreement is a valid contract pursuant to Sections 8(e) and (f) of the Act, Specification 13.1 unduly interferes with the area of labor negotiations which Congress clearly intended to leave unregulated under the same statute: the collective bargaining process. *See Golden State I*, 475 U.S. at 614–16, 106 S.Ct. at 1398–99.

C. *Proprietary or regulatory interest*

In *Wisconsin Dept. of Indus. v. Gould*, 475 U.S. 282, 106 S.Ct. 1057, 89 L.Ed.2d 223 (1986), the Court struck down a state statute barring repeat violators of the NLRA from bidding on state contracts as preempted under the *Garmon* doctrine. *Gould*, 475 U.S. at 291, 106 S.Ct. at 1063. The state argued that it should not be restricted by the Commerce Clause when it acts as a market participant. The Court rejected this argument, noting first, that the state was functioning more as a regulator than as a market participant, and second, that the exception to the Commerce Clause might be broader than state action allowed under the NLRA. *Id.* at 289–90, 106 S.Ct. at 1062–63. The Court based its analysis on the differing purposes served by the Commerce Clause and the NLRA: whereas the Commerce Clause contains " 'no indication of a constitutional plan to limit the ability of the States themselves to operate in the free market,' ... [t]he NLRA, in contrast, was designed in large part to 'entrust administration of the labor policy for the Nation to a centralized administrative agency.' " *Id.* (citations omitted).

In concluding the *Gould* opinion, the Court explored, but did not define, the boundaries of its holding:

We do not say that state purchasing decisions may never be influenced by labor considerations, any more than the NLRA prevents state regulatory power from ever touching on matters of industrial relations. Doubtless some state spending policies, like some exercises of the police power, address conduct that is of such "peripheral concern" to the NLRA, or that implicates "interests so deeply rooted in local feeling and responsibility," that pre-emption should not be inferred. *Garmon*, 359 U.S. at 243–44 [79 S.Ct. at 778]; *see also, e.g., Belknap, Inc. v. Hale*, 463 U.S. 491, 498 [103 S.Ct. 3172, 3177, 77 L.Ed.2d 798] (1983). And some spending determinations that bear on labor relations were intentionally left to the States by Congress. *See New York Tel. Co. v. New York State Labor Dept.*, 440 U.S. 519 [99 S.Ct. 1328, 59 L.Ed.2d 553] (1979).

*Gould*, 475 U.S. at 291, 106 S.Ct. at 1063. Having opened this door, however, the Court firmly closed it on the Wisconsin rule at issue, stating that "[w]e are not faced here with a statute that can even plausibly be defended as a legitimate response to state procurement constraints or to local economic needs, or with a law that pursues a task Congress intended to leave to the States." *Id.*

Appellees submit that this language creates an exception to the preemption doctrine arising out of the distinction between a state's interest as proprietor versus its interest as regulator. Where a spending decision such as Specification 13.1 is animated by the exigency of doing business rather than the regulation of labor relations; where the measure's effect on labor relations is incidental to a legitimate and necessary proprietary purpose; that measure, argue appellees, is saved from preemption by the supposed *Gould* exception. As a subsidiary proposition, appellees also contend that the MWRA's action would be lawful under Sections 8(e) and (f) were it undertaken by a private employer, and that there is no basis under the NLRA to treat a state more harshly than a comparably situated private party.

■ We can dispose of the latter contention quite briefly before moving to the more troublesome principal point. First, Congress is perfectly capable of distinguishing between states and private parties when it chooses, and it has so chosen here. Sections 8(e) and (f) refer to "employers." The Act states that the term "employer" "shall not include ... any State or political subdivision thereof." 29 U.S.C. § 152(2). Thus it is clear that the MWRA is not encompassed by Sections 8(e) and (f), and its conduct cannot be compared with what might be acceptable conduct by a private employer.[25]

Moreover, the Court itself has underscored the state/private distinction, in the very case appellees use to support their proprietary interest argument. The *Gould* opinion states:

[G]overnment occupies a unique position of power in our society, and its conduct, regardless of form, is rightly subject to special restraints. Outside the area of

Commerce Clause jurisprudence, it is far from unusual for federal law to prohibit States from making spending decisions in ways that are permissible for private parties. The NLRA, moreover, has long been understood to protect a range of conduct against state but not private interference. The Act treats state action differently from private action not merely because they frequently take different forms, but also because in our system States simply are different from private parties and have a different role to play.

*Gould,* 475 U.S. at 290, 106 S.Ct. at 1063. Thus it is plain that the private employer comparison merits little weight. The MWRA is an arm of the state, and its actions must be judged accordingly.[26]

■ Moving to the issue of proprietary interest, we find that we are ultimately unpersuaded that such an exception, if it exists at all, applies in this case. Other than the dicta in *Gould,* the Supreme Court has never articulated—much less applied—a proprietary interest exception. Moreover, the cases cited in *Gould* do not support an exception for the situation at hand. *Belknap v. Hale,* 463 U.S. at 509, 103 S.Ct. at 3182, is one of a line of cases permitting state tort law remedies to coexist with the NLRA. *See supra* at p. 353. These cases merely indicate application of the *Garmon* analysis allowing state action in "peripheral" areas. *Garmon,* 359 U.S. at 243, 79 S.Ct. at 778. For an example of a "spending determination" addressing "state procurement constraints" or "local economic need," *Gould,* 475 U.S. at 291, 106 S.Ct. at 1063, the Court cited *New York Tel. Co. v. New York State Labor Dept.,* 440 U.S. 519, 99 S.Ct. 1328, 59 L.Ed.2d 553 (1979). In that case, the Court found no preemption where the state sought to impose a mandatory minimum benefit (unemployment compensation)

---

**25.** There are, of course, federal statutes other than the NLRA which treat the actions of states and private parties differently. *See, e.g.,* the Sherman Antitrust Act, 15 U.S.C. §§ 1, 7 (prohibiting certain private conduct but exempting the states); the Securities Act, 15 U.S.C. § 77c (exempting government securities from the Act's provisions); the Civil Rights Act, 42 U.S.C. § 1983 (prohibiting certain state conduct only).

**26.** The dissent appears to suggest that basing a distinction on whether or not an actor is an arm of the state is overly technical. *See* Op. at 364 (Breyer, C.J., dissenting). We disagree, and point again to the statutes cited *supra* n. 25, as well as the entire Bill of Rights.

through a law of general applicability. *Id.* at 545–46, 99 S.Ct. at 1343–44.[27] *See also Fort Halifax v. Coyne,* 482 U.S. 1, 22, 107 S.Ct. 2211, 2223, 96 L.Ed.2d 1 (1987) (upholding Maine statute requiring employers to provide severance pay); *Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 755, 105 S.Ct. 2380, 2397, 85 L.Ed.2d 728 (1985) (upholding state statute requiring certain minimum health benefits to be included in employee health plans). As this court has noted, because such a statute " 'neither encourages nor discourages the collective bargaining processes that are the subject of the NLRA,' it is 'a valid and unexceptional exercise of the State's police power.' " *Beckwith v. United Parcel Service, Inc.,* 889 F.2d 344, 349 (1st Cir.1989) (quoting *Metropolitan Life Ins.,* 471 U.S. at 755, 758, 105 S.Ct. at 2397, 2398). Plainly, the same cannot be said of Specification 13.1, which mandates adherence to a particular contract with a particular group of labor unions, in lieu of the collective bargaining process.

Our reading of the *Gould* "exception" is that it largely restates the *Garmon* proposition: Some state interference into the collective bargaining process is permitted if it, first, is "peripheral" to federal labor policy, or, second, pertains to matters "deeply rooted in local feeling and responsibility." *Garmon,* 359 U.S. at 243–44, 79 S.Ct. at 778–79. As we have stated *ante,* at p. 353, Specification 13.1 is a direct regulation of the collective bargaining process. Thus it can neither be termed "peripheral" nor "local." To be sure, the Boston Harbor clean-up is a matter of great local interest.

It is not the clean-up, however, which is being regulated; collective bargaining is being regulated, and that cannot be.

At any rate, *Garmon* is only one avenue of preemption under federal labor law—albeit one which most likely applies to Specification 13.1. This opinion, however, has rested largely on the *Machinists* doctrine as articulated in *Golden State I.* It is noteworthy that in *Golden State I,* once the Court had determined that the City of Los Angeles had directly interfered with the collective bargaining process, it expressly declined to consider the nature and extent of the City's interest in resolving the labor dispute. *Golden State I,* 475 U.S. at 617–18 and n. 8, 106 S.Ct. at 1400 and n. 8.[28] Yet the City would seem to have had a strong and legitimate interest in ensuring the adequacy of its transportation system, *see id.* at 620, 106 S.Ct. at 1401 (Rehnquist, J., dissenting)—at least tantamount to the MWRA's interest in ensuring speedy completion of the harbor clean-up. We can only conclude that the lesson of the *Golden State* cases is that, where interference into the collective bargaining process by the state is *direct,* an asserted state interest of the type at issue here, whether "proprietary" or otherwise, cannot justify the interference.

### D. *Other Allegations*

In view of our ruling on the issue of preemption of Specification 13.1 by the Act, it is unnecessary for us to reach the other questions raised by the appeal. *See Lane*

---

**27.** In *New York Tel.,* a plurality of the Court held that New York's unemployment benefits statute was not preempted despite the fact that it directly affected the economic balance between striking workers and struck employers. Justice Stevens, joined by two others, argued that because the unemployment statute was a benefits program of general applicability rather than a law directly targeting private conduct in the labor-management realm, it was more difficult to infer congressional intent to preempt it. *See New York Tel.,* 440 U.S. at 533, 99 S.Ct. at 1337 (plurality opinion). Five Justices disagreed that this distinction impacted the preemption inquiry. *See id.* at 549–50, 99 S.Ct. at 1345–46 (Blackmun, J., concurring), at 557–58,

99 S.Ct. at 1349–50 (Powell, J., dissenting). Justices Blackmun and Powell argued that when a law directly affects labor-management relations, whether the statute is of general applicability or is particularly directed at regulating labor-management relations is of little moment. By analogy, then, when a regulation such as Specification 13.1 directly affects labor-management relations, whether the regulation's purpose is proprietry or regulatory should be relatively insignificant.

**28.** The Court also did not reach the question of whether the *Garmon* "peripheral" exception even applies to a *Machinists* case. *Id.* at 618 n. 8, 106 S.Ct. at 1400 n. 8.

*v. First National Bank of Boston*, 871 F.2d 166, 168 (1st Cir.1989).

## V. CONCLUSION

Specification 13.1 unduly restricts aspects of the labor-management relationship intentionally left unregulated by Congress and is thus preempted by the National Labor Relations Act, as amended, 29 U.S.C. § 151, *et seq.* The decision of the district court is reversed. The district court, at the direction of this court in its original panel opinion in this case, has already issued a preliminary injunction against enforcement of Specification 13.1. That injunction remained in force during the pendency of the rehearing *en banc.* Therefore, we simply order that the preliminary injunction continue in effect during the further proceedings in this case.

*Reversed and remanded.* Costs to appellants.

BREYER, Chief Judge, with whom CAMPBELL, Circuit Judge joins (dissenting).

The Commonwealth of Massachusetts, acting through the Massachusetts Water Resources Authority, will let contracts for more than $6 billion of construction work on the Boston Harbor Clean–Up Project. The MWRA requires, as a condition for a contract award, that the winning bidder abide by (and insist that its subcontractors abide by) a prehire bargaining agreement. That agreement requires the contractors and subcontractors to recognize the Building Trades Council as bargaining representative for all craft employees, to hire workers through the hiring halls of the Council's constituent unions, to require hired workers to join the relevant union within seven days, to follow specified dispute-resolution procedures, to apply the Council's wage, benefit, seniority, apprenticeship and other rules, and to make contributions to the Council unions' benefit funds. In return for the MWRA's promise to insist that contractors sign the agreement, the Council has promised the MWRA labor peace throughout the 10–year life of the construction project.

Were the industry here involved other than the construction industry, we could understand how the majority would consider this agreement a rather intrusive effort by a state agency to control the labor relations of subcontractors with their employees. The construction industry, for labor-relations purposes, however, is special. As all parties concede, the special construction-industry provisions in §§ 8(e) & (f) of the National Labor Relations Act, 29 U.S.C. §§ 158(e) & (f), would permit the MWRA, were it a *private* party letting construction contracts, to act just as it wishes to act here. Indeed, general contractors in the construction industry often enter into prehire agreements of this sort. The only question in this case is whether the NLRA forbids the MWRA, because it is a state agency, to do what the Act explicitly permits a private contractor to do.

The NLRA does not contain any language that *explicitly* forbids a state, acting like a general construction contractor, from entering into a prehire agreement. Rather, the majority believes that the Act *implicitly* forbids it from doing so, *i.e.*, that the Act implicitly removed, or preempted, a state's power to act as the MWRA has acted here. Applying general principles of pre-emption, the majority must therefore believe (1) that the MWRA's action "conflicts with" the Act, (2) that it "frustrate[s] the federal [statutory] scheme," or (3) that it appears "from the totality of the circumstances that Congress sought to occupy the field to the exclusion of the states." *Malone v. White Motor Corp.*, 435 U.S. 497, 504, 98 S.Ct. 1185, 1189, 55 L.Ed.2d 443 (1978) (setting forth general conditions for pre-emption); *see also Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 300, 108 S.Ct. 1145, 1150, 99 L.Ed.2d 316 (1988). We do not see how permitting a state agency, when acting like a general contractor, to make labor agreements just like those that private general contractors make, could "conflict with" the NLRA, "frustrate" the NLRA "scheme," or otherwise interfere with the regulatory system that the NLRA creates. We therefore dissent.

The Supreme Court has described two related sets of concerns that led Congress, implicitly, to forbid certain kinds of state activities. First, Congress intended to grant the National Labor Relations Board *exclusive* authority to determine whether § 8 of the Act prohibits or § 7 of the Act protects certain particular labor-related activities and to provide remedies for violations. Thus, (with a few narrow exceptions) a state may not regulate activities that the Act arguably prohibits or protects. *See San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 244–45, 79 S.Ct. 773, 779, 3 L.Ed.2d 775 (1959). Nor may it add to, or subtract from, the remedies that the federal scheme provides. *See Garner v. Teamsters Local Union No. 776*, 346 U.S. 485, 498–99, 74 S.Ct. 161, 169–70, 98 L.Ed. 228 (1953).

Second, Congress intended to "leave some activities unregulated and to be controlled by the free play of economic forces." *Lodge 76, Int'l Ass'n of Machinists v. Wisconsin Employment Relations Comm'n*, 427 U.S. 132, 144, 96 S.Ct. 2548, 2555, 49 L.Ed.2d 396 (1976). Thus, states may not regulate "economic warfare between labor and management," *New York Tel. Co. v. New York State Labor Dep't*, 440 U.S. 519, 530, 99 S.Ct. 1328, 1335, 59 L.Ed.2d 553 (1979), when doing so significantly interferes with the "intentional balance" that Congress contemplated "between the uncontrolled power of management and labor to further their respective interests." *Golden State Transit Corp. v. City of Los Angeles*, 475 U.S. 608, 614, 106 S.Ct. 1395, 1398, 89 L.Ed.2d 616 (1986). They may not, for example, award damages for peaceful secondary picketing, *see Local 20, Teamsters Union v. Morton*, 377 U.S. 252, 258, 84 S.Ct. 1253, 1257, 12 L.Ed.2d 280 (1964), or forbid a union's concerted refusal to work overtime, *see Machinists*, 427 U.S. at 149, 96 S.Ct. at 2557, for, in both instances, Congress intended "to preserve" those "means of economic warfare for use during the bargaining process." *New York Tel.*, 440 U.S. at 530, 99 S.Ct. at 1335.

The majority finds this second kind of pre-emption present here. It concludes that the MWRA has regulated the relationship between labor and management in a way that upsets the "balance" between labor and management that Congress intended. In our view, however, the special construction industry exceptions in the Act itself show that Congress did not intend pre-emption. Insofar as the MWRA's purchasing decision affects labor-management relations, it does so only to the extent that Congress foresaw and (with respect to general contractors) explicitly authorized. Moreover, the relevant Supreme Court cases in this area reinforce our view that the MWRA's actions do not "conflict with" or otherwise "frustrate" the NLRA or its objectives.

1. *The Act's Construction–Industry Exceptions.* The construction-industry exceptions of the NLRA make clear that the conditions that the MWRA wishes to impose do not represent an effort by the state to tilt the economic playing field, that is to say, to interfere with the "free play of economic forces" between subcontractors and their employees, in a manner that Congress did not intend to permit. Rather, Congress defined the playing field in the construction industry (but not elsewhere) in a special way: it permitted a general contractor to insist that subcontractors enter into prehire agreements of the very sort here at issue. Thus, when the MWRA, acting in the role of purchaser of construction services, acts just like a private contractor would act, and conditions its purchasing upon the very sort of labor agreement that Congress explicitly authorized and expected frequently to find, it does not "regulate" the workings of the market forces that Congress expected to find; it exemplifies them.

To understand how this is so, consider how the construction-industry exceptions work within the context of the Act. The Act, in §§ 8(a), (b) and (e), 29 U.S.C. §§ 158(a), (b) & (e), lists a set of "unfair labor practices." For example, it says in §§ 8(a)(1) and 7 that employers may not interfere with their employees' efforts to organize collectively or discriminate against union members, *id.* §§ 158(a)(1) &

157; it says in § 8(b)(4) that labor organizations may not engage in secondary boycotts, *id.* § 158(b)(4); and, it requires in §§ 8(a)(5) and 8(b)(3) that both employers and labor organizations bargain collectively, *id.* §§ 158(a)(5) & 158(b)(3). Then, in § 8(f), the Act creates a specific construction-industry exception. That exception says:

> (f) It shall not be an unfair labor practice under subsections (a) and (b) ... for an employer engaged primarily in the building and construction industry to make an agreement covering employees engaged (or who, upon their employment will be engaged) in the building and construction industry with a labor organization [in the construction industry] ... because (1) the majority status of such labor organization has not been established ..., or (2) such agreement requires as a condition of employment, membership in such labor organization after the seventh day following the beginning of such employment ..., or (3) such agreement requires the employer to notify such labor organization of opportunities for employment with such employer, or gives such labor organization an opportunity to refer qualified applicants for such employment, or (4) such agreement specifies minimum training or experience qualifications for employment or provides for [seniority requirements]....

*Id.* § 158(f). Without this exception a construction-industry prehire agreement might constitute an unfair labor practice, for such an agreement (naming the unions to which all employees of all contractors and subcontractors must belong) might be seen as interfering with employees' rights to bargain through representatives of their own choosing, in violation of §§ 8(a)(1) and 7, *see id.* §§ 158(a)(1) & 157, or unreasonably discriminating against those who are not union members, in violation of § 8(a)(3). *See id.* § 158(a)(3).

Section 8(e) supplements the list of unfair labor practices contained in §§ 8(a) and (b) of the Act. It says that it is an unfair labor practice for a labor organization and an employer to enter into what is known, colloquially, as a hot-cargo agreement, an agreement whereby a secondary employer agrees to help a union (engaged in a dispute with a different, primary, employer) by refusing to do business with that other, primary, employer. *See id.* § 158(e). However, a special construction-industry exception, attached to section (e), says:

> [N]othing in this subsection shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction....

*Id.* Without this second exception, a construction-industry prehire agreement might violate the hot-cargo prohibition, for it requires a signing contractor to "cease doing business" with a subcontractor unless the subcontractor enters into a similar hiring agreement with the union.

The background of these subsections makes clear why Congress chose to create an exception for the construction industry, and those reasons have nothing at all to do with the private or public nature of the general contractor. Labor and management in the construction industry engaged in prehire bargaining long before Congress passed the NLRA. *See To Amend the National Labor Relations Act, 1947, with Respect to the Building and Construction Industry: Hearings on S. 1973 Before the Subcomm. on Labor and Labor–Management Relations of the Senate Comm. on Labor and Public Welfare*, 82d Cong., 1st Sess. 42 (1951) [hereinafter *Hearings* ] (testimony of William E. Maloney, Vice Pres., Building and Construction Trades Dep't, Pres., Operating Engineers, A.F. of L.). The language of the 1935 Wagner Act seemed to outlaw prehire agreements, because, for example, the unions with whom employers would negotiate these agreements typically did not meet the Act's representational requirements. Nonetheless, the prehire bargaining practice continued. The NLRB initially refused to extend its jurisdiction to the construction industry. It said that activity in the construction industry did not "affect commerce." *See* S.Rep. No. 1509, 82d Cong., 2d Sess. 4 (1952) (cit-

ing *In re Brown & Root, Inc.*, 51 N.L.R.B. 820 (1943)).

By the late 1940s, however, federal courts had held that the Board must exercise jurisdiction over this industry. *See* S.Rep. No. 1509, *supra*, at 4. And, the Board eventually concluded that the Taft–Hartley Act of 1947 required it to do so. Consequently, the Board began to invalidate union-security clauses in prehire agreements, and it began to require union-certification elections. This effort to force elections proved unsuccessful. *Id.* at 5. The Board then announced that it would no longer insist on certification elections, but it would continue to invalidate clauses in prehire agreements when it confronted them. *Id.* at 5–6.

Soon thereafter, the Senate Subcommittee on Labor and Labor–Management Relations held hearings on the construction industry. *See Hearings, supra.* Representatives of both labor and management testified that the special characteristics of the construction industry made it impracticable, unnecessary and undesirable to comply with the requirements of the Wagner Act (as amended by the Taft–Hartley Act). They pointed out that a construction worker typically works at a particular work site only for a short time. In such a context, to require formal certification elections is impracticable, for particular employees would not stay on the job long enough to elect representatives who then would bargain with the employer. Those testifying feared that the alternative to prehire bargaining would be no bargaining at all. Without prehire bargaining, unions would not be able to bargain for union security, while contractors would not be able to estimate their labor expenses in advance and would not be able to rely on a steady supply of labor from union hiring halls. *See generally* S.Rep. No. 1509, *supra*, at 3–6 (summarizing testimony at hearing).

The Senate Committee on Labor and Public Welfare then favorably reported a bill that would permit prehire agreements. It said:

The committee finds that the normal election procedures of the Board have proven unadaptable to this industry because of the short-term, casual employment that is typical to it. The General Counsel's efforts to devise special means ... have proven fruitless. We conclude that the obstacles to conducting satisfactory elections in sufficient numbers are formidable, if not insuperable.

S.Rep. No. 1509, *supra*, at 6. The bill did not become law for some time. But, in 1959, Congress enacted a similar bill. Both the House and Senate Reports accompanying the 1959 bill indicate that the reasons for the exception of § 8(f) were those identified in the 1951 hearings, namely, the short-term nature of employment, the impracticability of holding certification elections, the contractors' need for predictable cost and a steady supply of labor, and the longstanding custom of prehire bargaining in the industry. *See* S.Rep. No. 187, 86th Cong., 1st Sess., 27–29 (1959), *reprinted in* 1 NLRB, *Legislative History of the Labor–Management Reporting and Disclosure Act of 1959*, 423–25 (1985) [hereinafter *Legislative History*] (set out in Appendix); H.R.Rep. No. 741, 86th Cong., 1st Sess., 19–20 (1959), *reprinted in* 1 *Legislative History, supra*, at 777–78; *see also* 105 Cong.Rec. S5731 (daily ed. April 21, 1959), *reprinted in* 2 *Legislative History, supra*, at 1064 (remarks of Sen. Javits); 105 Cong. Rec. S5767 (daily ed. April 21, 1959), *reprinted in* 2 *Legislative History, supra*, 1082 (remarks of Sen. Goldwater); 105 Cong.Rec. S9117 (daily ed. June 8, 1959), *reprinted in* 2 *Legislative History, supra*, at 1289 (prepared statement of Sen. Goldwater); 105 Cong.Rec. H14,204 (daily ed. Aug. 11, 1959), *reprinted in* 2 *Legislative History, supra*, at 1577 (prepared statement of Rep. Rayburn); 105 Cong.Rec. H16,630 (daily ed. September 4, 1959), *reprinted in* 2 *Legislative History, supra*, at 1715 (remarks of Sen. Kennedy); 105 Cong. Rec. A4308 (daily ed. May 21, 1959), *reprinted in* 2 *Legislative History, supra*, at 1750 (remarks of Rep. Kearns). At the same time, Congress enacted an exception to § 8(e), so that its prohibition of hot-cargo clauses would not prevent parties in the construction industry from entering into prehire agreements, which, traditionally, in-

cluded a provision requiring the general contractor to award bids only to subcontractors who would sign the prehire agreement. *See* 105 Cong.Rec. S16,414 (daily ed. September 3, 1959), *reprinted in* 2 *Legislative History, supra,* at 1432 (remarks of Sen. Kennedy) (stating that the proviso of § 8(e) was "necessary to avoid serious damage to the pattern of collective bargaining in [the construction] industr[y]"); 105 Cong.Rec. S16,414 (daily ed. September 3, 1959), *reprinted in* 2 *Legislative History, supra,* at 1721 (remarks of Rep. Thompson) (same).

As the majority correctly points out, the construction-industry exceptions use the word "employer," and § 2(2) of the Act specifically excludes "any State" from its definition of the word "employer." *Ante,* at 354–55, 358. That fact, however, does not destroy the relevance of the exceptions as an indication of Congress's pre-emptive intent. For one thing, the provisions show that Congress specifically focused upon the conduct in question, prehire bargaining, that Congress found that conduct prevalent in the construction industry, and that it wrote the exceptions with the expectation that the conduct would continue in that industry.

For another thing, the *reasons* Congress gave for authorizing the conduct have nothing to do with the public or the private nature of the employer. The special circumstances in the construction industry making meaningful posthire collective bargaining difficult; the corresponding custom in the industry; a general contractor's need to predict labor costs; his need to have available a steady supply of labor: these reasons have to do with the nature of the construction industry and collective bargaining in that industry, conditions likely to remain the same whether a public or private contractor lets contracts for the work.

Further, to permit private general contractors, but not states, to enter into construction-industry prehire agreements would likely produce an odd crazy-quilt of prehire practices. Whether one finds such an agreement would often reflect, not size of the project, or desire of the parties, or special conditions of the industry, but simply whether or not the entity letting the contracts is an arm of the state or private. And, even among state projects, the presence or absence of such an agreement would depend upon whether state law permits the state in question to hire a private general contractor (who, then, presumably, would be free to enter into a prehire agreement), or, as in Massachusetts, requires the state agency to sign the relevant contracts itself. *See* Mass.Gen.L. ch. 30, § 39M; *id.* ch. 149, § 44A *et seq.* We do not understand what purpose, related to labor law, these legal distinctions could serve.

Finally, Congress had two perfectly good reasons for not making the construction-industry exceptions explicitly applicable to states, and neither of these reasons suggests any pre-emptive intent. First, the obvious reason is that the list of forbidden practices, to which the exceptions apply, itself applies only to an "employer," defined to exclude "any State," thereby leaving the regulation of labor relations between a state and its own employees primarily to state law. A drafter, writing a statutory exception to the resulting prohibition, would not normally extend its scope beyond those subject to the prohibition in the first place. Second, Congress, particularly when it enacted the construction-industry exceptions in 1959, had little reason to believe that a court might find, hidden in the silence of the Act, some other relevant prohibition applicable to a state.

In sum, the construction-industry exceptions in the Act, including their history and rationale, indicate that when a state acts as an ordinary private purchaser of construction services, it can enter into a typical prehire agreement without "frustrat[ing]" the "federal [statutory] scheme." *Malone,* 435 U.S. at 504, 98 S.Ct. at 1190.

2. *Supreme Court Precedent.* Unlike the majority, we believe that the relevant Supreme Court decisions offer fairly strong support for our conclusions. For one thing, the *Machinists* case itself makes clear that the Act does not forbid all state action that might favor labor, but, rather, only those state actions that interfere with

Congress's *"intentional* balance." *See Golden State,* 475 U.S. at 614, 106 S.Ct. at 1398 (citing *Machinists,* 427 U.S. at 146, 96 S.Ct. at 2556) (emphasis added). Here, for reasons just mentioned, we believe Congress intended a "balance" in the construction industry that includes prehire agreements.

For another thing, the Supreme Court has looked to legislative history (indeed, the language and history of *other* congressional statutes), as we have done here, to find the existence or absence of a congressional pre-emptive intent. After examining legislative history that would seem no more significant than that present here, for example, the Court upheld a state law providing unemployment benefits to striking workers, a law that would seem to tip the playing field in the strikers' favor. *See New York Tel.,* 440 U.S. 519, 99 S.Ct. 1328.

Further, the Court has indicated that the kind of state activity involved is relevant to the pre-emption question. After all, the NLRA seems basically intended to supplant state labor regulation, not to supplant all legitimate state activity that might affect labor. Thus, it is not surprising that the relevant Supreme Court cases, speaking of the area where Congress implicitly intended labor-management relations "to be controlled by the free play of economic forces," refer to freedom from state *regulation.* In *Machinists* itself, for example, the Supreme Court refers to the relevant congressional pre-emptive intent as an intent to "leave some activities *unregulated."* 427 U.S. at 144, 96 S.Ct. at 2555. It said that the "activities" in question—workers deciding in concert to refuse overtime work—"were not to be *regulable* by States...." *Id.* at 149, 96 S.Ct. at 2557 (emphasis added). And, in *Golden State,* the Court, finding that California could not condition the renewal of a taxicab franchise upon settlement of a labor dispute, said that *"Machinists* pre-emption ... precludes state and municipal *regulation* 'concerning conduct that Congress intended to be unregulated.'" 475 U.S. at 614, 106 S.Ct. at 1398 (quoting *Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 749, 105 S.Ct. 2380, 2394, 85 L.Ed.2d 728

(1985)) (emphasis added). At the same time, the Court has noted that even though *Machinists* pre-emption "does not involve in the first instance a balancing of state and federal interests," an "appreciation of the State's interest in regulating a certain kind of conduct may still be relevant in determining whether Congress in fact intended the conduct to be unregulated." *Metropolitan Life,* 471 U.S. at 749–50 n. 27, 105 S.Ct. at 2394 n. 27.

Finally, when the Court has considered state *purchasing,* it has carefully considered the nature of the state's action and the legitimacy of the restriction's purpose. In *Wisconsin Department of Industry, Labor and Human Relations v. Gould, Inc.,* 475 U.S. 282, 106 S.Ct. 1057, 89 L.Ed.2d 223 (1986), the Court found pre-emption of a Wisconsin purchasing-related rule—a rule that disqualified as a supplier any firm found to have committed several unfair labor practices. In doing so, the Court stressed the lack of any such legitimate relation in the case before it. The Court said that "debarment ... serves plainly as a means of enforcing the NLRA," *id.* at 287, 106 S.Ct. at 1061, that it "functions *unambiguously* as a supplemental sanction for violations of the NLRA," *id.* at 288, 106 S.Ct. at 1062 (emphasis added), and *"[n]o other purpose* could credibly be ascribed." *Id.* at 287, 106 S.Ct. at 1061 (emphasis added). The Court concluded that, because *"Wisconsin simply is not functioning as a private purchaser of services,* for all practical purposes, Wisconsin's debarment statute is tantamount to regulation." *Id.* at 289, 106 S.Ct. at 1062 (emphasis added). To emphasize the point—that Wisconsin was not acting like "a private purchaser of services"—the Court added:

We do not say that state purchasing decisions may never be influenced by labor considerations, any more than the NLRA prevents state regulatory power from ever touching on matters of industrial relations. Doubtless some state spending policies, like some exercises of the police power, address conduct that is of such 'peripheral concern' to the

NLRA, or that implicates 'interests so deeply rooted in local feeling and responsibility,' that pre-emption should not be inferred. *Garmon*, 359 U.S., at 243–244 [79 S.Ct., at 778–779]; see also, *e.g.*, *Belknap, Inc. v. Hale*, 463 U.S. 491, 498 [103 S.Ct. 3172, 3177, 77 L.Ed.2d 798] (1983). And some spending determinations that bear on labor relations were intentionally left to the States by Congress. See *New York Tel. Co. v. New York State Labor Dept.*, 440 U.S. 519 [99 S.Ct. 1328, 59 L.Ed.2d 553] (1979). But Wisconsin's debarment rule clearly falls into none of these categories. *We are not faced here with a statute that can even plausibly be defended as a legitimate response to state procurement constraints or to local economic needs, or with a law that pursues a task Congress intended to leave to the States.* The manifest purpose and inevitable effect of the debarment rule is to enforce the requirements of the NLRA.

*Id.* at 291, 106 S.Ct. at 1063–64 (emphasis added).

In the case before us, the record makes clear that the MWRA is participating in a market place as a general contractor, like a private buyer of services. Its role as buyer is not, in any sense, a sham designed to conceal an effort to regulate. That role is direct, normal, and necessary for *purchasing*, not *regulatory*, reasons. The MWRA wants to condition its contracts in the same way as, and for the same reasons as, private contractors normally insist upon similar conditions, namely to obtain peaceful working conditions, necessary to get the job done on time. The record requires us to take as given that, without a prehire agreement, hundreds of collective-bargaining agreements would expire during the life of the project, making labor strife likely. Because the major work site, Deer Island, is connected by a narrow isthmus to the mainland, a small number of pickets would find it easy to stop the entire project. Court-ordered deadlines mean that delay would cause unusually serious problems. The record therefore supports the MWRA's contention that the prehire agreement serves its economic self-interest as a purchaser, that it is a "legitimate response to state procurement constraints or to local economic needs." *Id.*

The majority says that the language from *Gould* set out above contains only "dicta," and points out that the pre-emption at issue in *Gould* was *Garmon* pre-emption (pre-emption of state action regulating conduct that is arguably protected or forbidden by the NLRA), not *Machinists* pre-emption (pre-emption of state action regulating conduct that Congress intended to be controlled by the free play of economic forces only). Nonetheless, the "dicta" seem carefully considered, in a unanimous opinion. The fact that *Garmon* rather than *Machinists* pre-emption was at issue seems beside the point. Why would Congress want to leave the states *greater* freedom to interfere with control by the NLRB than to interfere with control by economic forces? Most important, the "dicta" suggest that the state's reasons for a labor-affecting condition are highly relevant, at least when the state is acting as an ordinary buyer. And, as we have just pointed out, the MWRA's reasons are legitimate.

In sum, the MWRA is acting like a buyer, and its reasons for the labor-related condition are legitimate. Furthermore, Congress specifically focused on the conduct in question and, in the case of private contractors, sanctioned it. In this context, we cannot say that the MWRA's actions "conflict" with the NLRA or would "frustrate" its purposes. We conclude that Congress did not pre-empt this state activity. Accordingly, we dissent. (We see no reason, since we are in dissent, to express our views on the other issues in the case, though we add that our views are similar to those of the district court.)

## APPENDIX:

*S.Rep. No. 187, 86th Cong., 1st Sess., 27–29 (1959).*

The problems of the building and construction industry under the Taft–Hartley Act have been the subject of considerable comment by authorities in the field; and Congress in previous years

has made several attempts to correct the shortcomings of the act as applied to the industry. The occasional nature of the employment relationship makes this industry markedly different from manufacturing and other types of enterprise. An individual employee works for many employers and for none of them continuously. Jobs are frequently of short duration, depending upon various stages of construction.

During the Wagner Act period, the National Labor Relations Board declined to exercise jurisdiction over the industry not only because of these complexities but also because the industry was substantially organized and hence had no need of the protection by the act. Concepts evoked by the Board therefore developed without reference to the construction industry. In 1947, after passage of the Taft–Hartley amendments, the Board applied the provisions of the act to the building and construction industry.

That this application of the act to the construction industry has given rise to serious problems is attested by the following in which the difficulties of the industry are set forth in detail:

[citing congressional hearings and presidential messages].

The bill endeavors to resolve certain most urgent problems, leaving to the future other difficulties which require attention.

*Characteristics of the industry and the bill*

In the building and construction industry it is customary for employers to enter into collective bargaining agreements for periods of time running into the future, perhaps 1 year or more or in many instances as much as 3 years. Since the vast majority of building projects are of short duration, such labor agreements necessarily apply to jobs which have not been started and may not even be contemplated. The practice of signing such agreements is not entirely consistent with the Wagner Act rulings of the NLRB that exclusive bargaining contracts can lawfully be concluded only if the union makes its agreement after a representative number of employees have been hired. One reason for this practice is that it is necessary for the employer to know his labor costs before making the estimate upon which his bid will be based. A second reason is that the employer must be able to have available a supply of skilled craftsmen ready for quick referral. A substantial majority of the skilled employees in this industry constitute a pool of such help centered about their appropriate craft union. If the employer relies upon this pool of skilled craftsmen, members of the union, there is no doubt under these circumstances that the union will in fact represent a majority of the employees hired.

. . . .

The bill, as did [an earlier version], contains other provisions which take into account the occasional nature of employment in the building and construction employee. It does so by reducing from 30 days to 7 the grace period before which the employee may be required to join the union. The reduction in this time allowance reflects the normally short employment period for construction employees. Also similar to [the earlier version] are provisions permitting an exclusive referral system or hiring hall based upon objective criteria for referral. Such criteria as are spelled out in the bill are not intended to be a definitive list but to suggest objective criteria which shall be applied without discrimination. Thus it is permissible to give preference based upon seniority, residence, or training of the sort provided by the apprenticeship programs sponsored by the Department of Labor. These provisions are not intended to diminish the right of labor organizations and employers to establish an exclusive referral system of the type permitted under existing law.