**GLENWOOD BRIDGE, INC., Appellant,**

**v.**

**CITY OF MINNEAPOLIS; John Doe; John Smith; Other Known Entities and Individuals; Appellees.**

**No. 91–1442.**

United States Court of Appeals, Eighth Circuit.

Submitted March 13, 1991.

Decided Aug. 2, 1991.

Rehearing and Rehearing En Banc Denied Oct. 31, 1991.

Timothy Sullivan, Minneapolis, Minn., for appellant.

Jerome Fitzgerald, Minneapolis, Minn., for appellees.

Before WOLLMAN and BEAM, Circuit Judges, and HEANEY, Senior Circuit Judge.

BEAM, Circuit Judge.

Glenwood Bridge, a Minnesota bridge-builder, appeals from the district court's order of March 7, 1991, denying its motion for a preliminary injunction. Glenwood Bridge seeks to restrain the City of Minneapolis from rejecting its low bid on the Fifth Street North Bridge Project and awarding the contract, after rebidding, to another contractor. The City's actions may or may not violate federal labor law. We think that Glenwood Bridge has shown a sufficient likelihood of success on the merits, however, that, together with a showing of irreparable harm, makes it entitled to preliminary relief. Accordingly, we reverse the judgment of the district court.

I. BACKGROUND

On December 5, 1990, the City advertised for bids to build a new Fifth Street bridge. Glenwood Bridge submitted a bid which, when the bids were opened on January 22, 1991, proved to be low. Nine days later, however, the City's purchasing department, in a letter to the chairman of the city council's transportation and public works committee, suggested that the city council reject all bids. As the letter-writer explained, "After reviewing the bids, it was determined that there was no project labor agreement in place for this bid." Letter from Richard L. Straub to Tony Scallon

(Jan. 31, 1991). The City claims that its review of the original bidding documents convinced it that without a labor stabilization agreement, the project might not be completed by November 15, 1991, in time for the holiday shopping season. Accordingly, the director of public works "recommended that we obtain a project labor agreement and ensure against any ... strikes or lockouts." *Id.*

When Glenwood Bridge was made aware of the City's concerns, it notified the City that its collective bargaining agreement with its union, the Christian Laborers Association Local No. 78 (CLA), an NLRB-certified labor organization, contained a no strike/no lockout clause. The city attorney advised the transportation and public works committee that this agreement was not good enough. "We have reviewed the Agreement and it is our opinion that it is not the kind of labor agreement which would protect the City from both strikes and lockouts." Letter from Robert J. Alfton to Tony Scallon (Feb. 7, 1991). The city attorney's letter specified no reasons why the agreement was insufficient. Indeed, Glenwood Bridge was later advised that its contract with the CLA providing for no strikes or lockouts would satisfy the City's concerns. *See* Transcript of Hearing on Motion for Preliminary Injunction at 9 (March 6, 1991) (Hearing Transcript).

Glenwood Bridge was so advised, however, only after the city council rejected all bids on February 8, 1991, and voted to readvertise the project. The City determined that it could best avoid strikes or lockouts by executing its authority under a Minnesota statute permitting the City to "enter into agreements ... with appropriate labor organizations and contractors which provide that no strike or lockout may be ordered during the term of the agreements." 1989 Minn.Sess.Law Serv. Ch. 54, sec. 2 (West). Accordingly, the City entered into a project labor stabilization

agreement with the Minneapolis Building and Construction Trades Council, AFL–CIO, which provides for no strikes or lockouts. The City then incorporated this agreement into its new bidding documents.

Glenwood Bridge did not submit a new bid, but instead filed this action in federal district court on February 13, 1991, alleging that the City's actions were preempted by federal labor law, and seeking damages and declaratory and injunctive relief. Specifically, Glenwood Bridge asked the court to prohibit the City from readvertising for bids and from incorporating the AFL–CIO labor stabilization agreement into the new bidding documents. Glenwood Bridge also asked the court to mandate that the City award it the bridge contract under its original bid. On February 15, Glenwood Bridge filed a motion for a temporary restraining order.

The district court granted, in part, the motion for temporary restraining order on February 21, 1991. In its order, the district court allowed the City to readvertise the project and to receive new bids, but "restrained and enjoined [the City] from opening the bids submitted in response to its readvertisement for bids." *Glenwood Bridge v. City of Minneapolis*, Civ. No. 3–91–85, Temporary Restraining Order (Feb. 21, 1991).[1] The district court considered preliminary injunctive relief at a hearing on March 6, 1991, at which hearing the court concluded that it did not have the authority under Minnesota law to "order the City to award the contract to Glenwood." Hearing Transcript at 13. Because it could not award the contract, "a preliminary injunction [pre]serving the status quo until the matter is resolved would therefore be of no point." *Id.* Thus, the district court denied the motion for preliminary injunction on March 7, but extended the temporary restraining order until 9:00 a.m. on March 11. *Glenwood Bridge v. City of Minneapolis*, Civ. No. 3–91–85, Or-

---

1. At the hearing, the district court considered the factors governing preliminary relief in the Eighth Circuit. *See Dataphase Sys. v. C L Sys.*, 640 F.2d 109, 114 (8th Cir.1981) (en banc). The district court found a strong case on the merits; an "open question on irreparable harm," al-

though the court found that Glenwood Bridge would suffer "substantial harm" if the bids were reopened; and that "the public interest cuts both ways." Transcript of Hearing on Motion for Temporary Restraining Order at 46–47 (Feb. 21, 1991).

der (March 7, 1991). Glenwood Bridge appealed from the district court's order to this court on March 7. We extended, on March 8, the temporary restraining order pending appeal and heard oral argument on March 13, 1991. After argument, on March 27, the City filed a motion to modify the temporary restraining order to allow demolition of the existing bridge.

On May 10, 1991, we filed an opinion affirming the district court's denial of Glenwood Bridge's motion for a preliminary injunction, vacating our earlier order extending the temporary restraining order pending appeal, and denying as moot the City's motion to modify the temporary restraining order. 932 F.2d 1239 On May 17, 1991, Glenwood Bridge filed a petition for rehearing with suggestion for rehearing en banc and a motion seeking an injunction to prohibit the City from either awarding the contract or beginning work on the project pending disposition of the petition for rehearing. By order of May 20, 1991, we issued an injunction "prohibiting [the City] from awarding the contract at issue and/or commencing work on the project contract until disposition of [Glenwood Bridge's] motion for rehearing and the suggestion for rehearing en banc." On May 23, 1991, the City filed a motion to increase the amount of the bond filed by Glenwood Bridge, and to allow the City to demolish the existing Fifth Street Bridge with its own forces. By order of May 28, 1991, we modified our May 20 injunction to do these things. Now, by this opinion, we grant rehearing by the panel, vacate the May 10 panel opinion, and substitute this opinion reversing the judgment of the district court.

## II. DISCUSSION

■ We review the district court's denial of injunctive relief for abuse of discretion. *Modern Computer Sys. v. Modern Bank-*

*ing Sys.*, 871 F.2d 734, 737 (8th Cir.1989) (en banc) ("Unless the district court's denial of injunctive relief is the product of an abuse of discretion or misplaced reliance on an erroneous legal premise, we may not reverse on appeal."). As indicated, the district court concluded that because, under Minnesota law, it could not mandate that the City award the contract to Glenwood Bridge, Glenwood Bridge suffered no irreparable injury; the only relief that could compensate Glenwood Bridge would be declaratory relief and money damages.[2] *See* Hearing Transcript at 13, 32. Glenwood Bridge, however, did not ask only that the district court award it the bridge contract; it also sought a preliminary injunction prohibiting the City from incorporating the AFL–CIO labor stabilization agreement into the bidding documents. *See id.* at 30–31 ("[I]f [the court is] not comfortable mandating the award, then the city should not be allowed to bid this project with an illegal specification."). In other words, the relief Glenwood Bridge still seeks—not explicitly addressed by the district court—would prohibit the City from awarding to any contractor a contract containing an arguably illegal pre-hire agreement. After careful consideration, we think that Glenwood Bridge is entitled to this relief.

■ In *Dataphase Sys. v. C L Sys.*, 640 F.2d 109, 114 (8th Cir.1981) (en banc), this court set forth the now-familiar criteria governing preliminary injunctions.

[W]hether a preliminary injunction should issue involves consideration of (1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest.

---

**2.** In ruling on the motion for a preliminary injunction, the district court noted "that the resolution of the preliminary injunction motion turns on one critical question: Could the Court under any circumstances order the City to award the Fifth Street Bridge Project to [Glenwood Bridge]? ... If the answer is no, then there is no irreparable harm." Hearing Tran-

script at 10–11. Thus, although the district court essentially found no irreparable harm, its finding was directly related to its conclusion that it could not award the contract to Glenwood Bridge. This explains why the district court did not explicitly consider each *Dataphase* factor, of which factors it was well aware. *See id.* at 5.

These criteria were reaffirmed en banc in *Modern Computer Sys.*, 871 F.2d at 737–38. In essence, the inquiry is an equitable one, requiring that we consider "whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Dataphase*, 640 F.2d at 113 (footnote omitted). While "no single factor is determinative" of this inquiry, *see id.*, two factors stand out in this case—the likelihood that Glenwood Bridge will prevail on the merits and the threat of irreparable injury. We begin with them.

▪ On the merits, Glenwood Bridge presents important and troubling questions about the City's conduct in this matter. Glenwood Bridge argues that the City's actions constitute unlawful interference with free collective bargaining—" 'the cornerstone of the structure of labor-management relations carefully designed by Congress when it enacted the NLRA.' " *Golden State Transit Corp. v. City of Los Angeles*, 475 U.S. 608, 619, 106 S.Ct. 1395, 1401, 89 L.Ed.2d 616 (1986) (*Golden State I* ) (quoting *New York Tel. Co. v. New York Labor Dept.*, 440 U.S. 519, 551, 99 S.Ct. 1328, 1347, 59 L.Ed.2d 553 (1979) (Powell, J., dissenting)). That is, Glenwood Bridge asserts that the City's actions are unlawful because they violate the rule of *Machinists v. Wisconsin Employment Relations Comm'n*, 427 U.S. 132, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976), which "precludes state and municipal regulation 'concerning conduct that Congress intended to be unregulated.' " *Golden State I*, 475 U.S. at 614, 106 S.Ct. at 1398 (quoting *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 749, 105 S.Ct. 2380, 2394, 85 L.Ed.2d 728 (1985)). The City's insistence that the low bidder on the bridge contract adhere to the labor stabilization agreement, Glenwood Bridge argues, is legally indistinguishable from the City of Los Angeles's conduct in *Golden State I*. There, the Supreme Court held that the City's action conditioning renewal of Golden State's taxicab franchise on settlement of an ongoing labor dispute was preempted by the NLRA; the City's action " ' "entered into the substantive aspects of the bargaining process to an extent Congress has not countenanced." ' " *Id.* at 616, 106 S.Ct. at 1399 (quoting *Machinists*, 427 U.S. at 149, 96 S.Ct. at 2557 (quoting *NLRB v. Insurance Agents' Int'l Union*, 361 U.S. 477, 498, 80 S.Ct. 419, 432, 4 L.Ed.2d 454 (1960))).

In *Associated Builders & Contractors v. Massachusetts Water Resources Auth.*, 935 F.2d 345 (1st Cir.1991) (en banc), the First Circuit recently considered these cases in a context similar to that presented by Glenwood Bridge. In *Associated Builders*, the Massachusetts Water Resources Authority (MWRA), charged with effecting the estimated $6.1 billion clean-up of Boston Harbor, authorized its project construction manager, Kaiser Engineers, Inc., to enter into a labor stabilization agreement with the Building and Construction Trades Council. The agreement adopted by MWRA and added to the bidding documents for all new construction work required that the trades council be recognized "as the sole and exclusive bargaining representative of all craft employees," *id.*, 935 F.2d at 348, and that any contractor employed in the project make contributions to union trust funds and observe union work rules and job classifications. As an organization representing over 18,000 non-union contractors, Associated Builders argued that the agreement effectively barred its contractors from obtaining any bids on the project, and therefore challenged it as preempted by the NLRA.

Considering the district court's denial of Associated Builders' motion for preliminary injunction, the First Circuit found that including the agreement in the bidding documents was preempted by the NLRA. *Id.* at 355–56. Relying in part on *Golden State I*, the court held:

> [T]he state's intrusion into the bargaining process is pervasive. The state not only mandates that a labor agreement be reached before a bid is awarded, but dictates with whom that agreement is going to be entered, and specifies what its contents shall be. For all intents and purposes the state here *eliminates* the bargaining process altogether.

*Id.* at 353. Whatever the state's interest in the scheduled and orderly completion of the project, the First Circuit held that it could not justify direct interference with the collective bargaining process. *Id.* at 359.

We think that the City is squarely confronted with *Golden State I* and *Machinists*-preemption. The City makes no serious effort to distinguish *Golden State I*, but merely asserts that, unlike the actions of the City of Los Angeles, its efforts to impose the labor stabilization agreement do not change the relative bargaining positions of the parties. Memorandum of Law in Opposition to Motion for Preliminary Injunction, Civ. No. 3–91–85 at 10–11 (March 1, 1991) (Memorandum of Law). The City instead seems to place its principal reliance on the statutory exceptions created by sections 8(e) and 8(f) of the NLRA, allowing certain actions in the construction industry (the sort of pre-hire agreement at issue here for instance) that would otherwise be unfair labor practices. *See* 29 U.S.C. § 158(e), (f) (1988). While the City orally argued to the district court that the application of these statutory exceptions distinguished this case from *Golden State I*, *see* Hearing Transcript at 26–28, the City contradicted itself by advising the district court in writing that because the definition of "employer" found in the NLRA does not include governmental bodies, *see* 29 U.S.C. § 152(2) (1988), "the express authorizations of sections 8(e) and 8(f) do not apply to the City." Memorandum of Law at 12 n. 3. As the First Circuit held in *Associated Builders*, "[t]he history of Sections 8(e) and (f) discusses private employers only; the silence as to permitted state regulation is deafening." *Associated Builders*, 935 F.2d at 357. Given the statutory exclusion of governmental bodies, we doubt that the City's actions can be sanctioned by sections 8(e) or 8(f).

In considering the likelihood that Glenwood Bridge will prevail on the merits, we note that we are not deciding whether Glenwood Bridge "will ultimately win." *See O'Connor v. Peru State College*, 728 F.2d 1001, 1002 (8th Cir.1984) ("The proceedings are at an early stage and to prejudge the evidence before it is fully collated

and demonstrated is basically unfair. Under these circumstances, the court should avoid deciding with any degree of certainty who will succeed or not succeed."). Glenwood Bridge presents a sufficiently strong case of federal preemption by the NLRA, however, that we think this factor rests heavily in its favor.

In isolation, of course, "[t]he likelihood that plaintiff ultimately will prevail is meaningless." *Dataphase*, 640 F.2d at 113. Indeed, in any case "[t]he threshold inquiry is whether the movant has shown the threat of irreparable injury." *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir.1987). Thus, we have held that the movant's failure to sustain its burden of proving irreparable harm ends the inquiry "and the denial of the injunctive request is warranted." *Id.* at 420. *Accord Modern Computer Sys.*, 871 F.2d at 738; *Dataphase*, 640 F.2d at 114 n. 9. We must inquire, then, whether Glenwood Bridge has met its burden of proving that it will suffer irreparable harm absent a preliminary injunction.

The City contends that Glenwood Bridge cannot establish irreparable harm because it can be compensated by money damages. We agree, at least, that Glenwood Bridge asserts a valid damages claim. *See* 42 U.S.C. § 1983 (1988); *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 110 S.Ct. 444, 450, 107 L.Ed.2d 420 (1989) (*Golden State II*). In *Golden State II*, the Court held that the petitioner-employer "is the intended beneficiary of a statutory scheme that prevents governmental interference with the collective-bargaining process and that the NLRA gives it rights enforceable against governmental interference in an action under § 1983." *Golden State II*, 110 S.Ct. at 450. *Golden State II* clearly establishes that Glenwood Bridge's complaint in this case states a valid cause of action for money damages. Thus, if Glenwood Bridge prevails on the merits, it can be compensated by money damages and a permanent injunction.

Yet we do not believe that this relief will fully compensate Glenwood Bridge for being denied its right to bid on a legal con-

tract. While money damages may compensate Glenwood Bridge for the profits it would have made had the City not rejected all bids, without a preliminary injunction the City will award to some other contractor a contract which, if Glenwood Bridge prevails on the merits, will contain an illegal labor stabilization agreement. A preliminary injunction, however, will prevent the City from awarding a contract on which, in essence, Glenwood Bridge is precluded from bidding. If Glenwood Bridge prevails on the merits, a preliminary injunction ensures that it will be able to rebid on a contract which does not contain the labor stabilization agreement. A preliminary injunction both protects this interest in participating in a legal bidding process and ensures that the contract awarded will be a legal one. It makes little sense to us to not consider this fact in the irreparable harm calculus.

Finally, we must consider the other two *Dataphase* factors—the balance between the irreparable harm to Glenwood Bridge and the harm that a preliminary injunction would cause to other parties, and the public interest. *Modern Computer Sys.*, 871 F.2d at 737–38. Given that the City's interest is theoretically the public's, to some extent these factors are connected. The primary harm caused by preliminary injunctive relief is delay in constructing the bridge. Delay inconveniences the public and may adversely affect others monetarily. We are well informed by the City of the need to complete the project expeditiously, but against the public interest in early completion, we must weigh the harm to Glenwood Bridge. We must also consider the public interest in ensuring a lawful bidding process and fair, unfettered collective bargaining. To this end, we are not unmindful that the primary reason for de-

lay is the City's yet unjustified rejection of Glenwood Bridge's initial low bid. To date, the City has failed to adequately explain why it denied Glenwood Bridge the contract.[3] As indicated, after the city attorney advised the city council that the no strike/no lockout provision in the agreement between Glenwood Bridge and its union was inadequate, the City apparently reversed its position. When asked about this at the preliminary hearing, counsel replied:

> I think [Glenwood Bridge's bid] was first rejected because on the first reading of it by the City Attorney's office, we were not satisfied with finding the no strike/no lockout language. On subsequent readings, we analyzed that and we thought that would be adequate to give the City the kind of protection it was seeking.

Hearing Transcript at 25. Counsel's answer merely restates the question; it does not explain why the City changed its mind. Such evasions merely lend credence to Glenwood Bridge's allegation that by its actions "the City seeks to stabilize its relations with the AFL–CIO for reasons not related to timely completion of the Project." Verified Complaint ¶ 15.[4] Whatever its reasons for rejecting all bids—reasons which will be determined on the merits—the City's actions detract from its urgings that the project be allowed to go forward regardless of the cost to Glenwood Bridge.

## III. CONCLUSION

Consideration of these factors convinces us that Glenwood Bridge is entitled to preservation of the status quo pending a decision on the merits. Accordingly, we vacate our order of May 28 prohibiting the City from awarding the contract and remand

---

**3.** The City argued to the district court that it rejected all bids because, in addition to adding the labor stabilization agreement, it needed to strengthen the liquidated damages and force majeure clauses. Memorandum of Law at 3–4; Affidavit of David Ybarra (Feb. 14, 1991). Yet the need for these changes was not mentioned in the city attorney's letter to Tony Scallon. As the district court noted at the injunction hearing, the City simply fails to address the evidence

that these reasons are pretextual. *See* Hearing Transcript at 10.

**4.** At the March 6, 1991, hearing on preliminary relief, the district court noted that "the actions of the city would lead one of common sense to the belief that there is something more than just seeming innocence involved in the manner in which the bid letting was handled." Hearing Transcript at 32.

this case to the district court to immediately enter a preliminary injunction to the same effect. The district court should, in considering the terms and conditions of such injunction, and based upon the evidence, impose security upon Glenwood Bridge in an amount that fairly protects the taxpayers of the City of Minneapolis should it be ultimately found that the City has been wrongfully enjoined. *See* Fed.R. Civ.P. 65(c). The district court should then conduct further proceedings on the merits. The judgment of the district court is reversed.

HEANEY, Senior Circuit Judge, dissenting in part and concurring in part.

I do not believe that Glenwood Bridge has established that either it or the public will be irreparably injured if it is not granted injunctive relief. To the contrary, it is clear that declaratory relief and damages will fully compensate Glenwood Bridge and protect the public interest if Glenwood Bridge is ultimately successful in this action. Additionally, Glenwood Bridge has not shown a sufficient likelihood of prevailing on the merits to warrant a preliminary injunction.

## LIKELIHOOD OF SUCCESS ON THE MERITS

Glenwood Bridge has not demonstrated that it is likely to succeed on the merits. To the contrary, the better view is that the National Labor Relations Act permits governmental units to enter into valid and enforceable section 8(e) and (f) prehire agreements on any public construction project.

In 1959, Congress amended federal labor policy in two important respects. First, it added 29 U.S.C. § 158(f). Landrum–Griffin Act, Pub.L.No. 86–257, § 705(a), 73 Stat. 525, 545 (1959). This section validates prehire agreements that recognize a union as the bargaining representative of prospective employees. The section accommodates the unique needs of construction-industry employers and employees. *See* S.Rep. No. 187, 86 Cong., 1st Sess. 55–56 (1959), U.S. Code Cong. & Admin.News 1959, p. 2318 *reprinted in* 1 NLRB *Legislative History*

*of the Labor–Management Reporting and Disclosure Act of 1959* 451–52 (1985); *see also John Deklewa & Sons*, 282 N.L.R.B. 1375 (1987) (discussing peculiarities of construction industry that motivated enactment of § 8(f)), *enforced*, 843 F.2d 770 (3d Cir.1988).

Second, Congress added 29 U.S.C. § 158(e) to the Act. Landrum–Griffin Act, Pub.L. No. 86–257, § 704(b), 73 Stat. 525, 543–44 (1959). This section permits agreements which require all contractors and subcontractors performing work at the project site to execute labor agreements, one purpose being to allocate the difficulties which may arise where union members work alongside nonunion laborers on the same construction site. *See Woelke & Romero Framing, Inc. v. N.L.R.B.*, 456 U.S. 645, 662 & n. 14, 102 S.Ct. 2071, 2081 & n. 14, 72 L.Ed.2d 398 (1982); *Connell Constr. Co. v. Plumbers & Steamfitters*, 421 U.S. 616, 629–30, 95 S.Ct. 1830, 1838–39, 44 L.Ed.2d 418 (1975).

In light of congressional action validating prehire agreements of the type at issue in this case, federal courts, including this one, have no right to intervene and invalidate them. If Glenwood Bridge believes that the contract violates federal law, its proper recourse is to file an unfair labor practice charge with the National Labor Relations Board.

I do not believe that either *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989), or *Employment Relations Commission v. Wisconsin*, 427 U.S. 132, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976), is on point. Neither case involved prehire agreements in the construction industry. *Associated Builders & Contractors v. Massachusetts Water Resources Authority*, 935 F.2d 345 (1st Cir.1991) (en banc), is on point, but in my view, was wrongly decided. I note that the First Circuit split three votes to two on the prehire agreement issue, with Chief Judge Breyer and Judge Campbell dissenting. The dissenters stated:

Indeed, general contractors in the construction industry often enter into pre-

hire agreements of this sort. The only question in this case is whether the NLRA forbids the MWRA, because it is a state agency, to do what the Act explicitly permits a private contractor to do.

The NLRA does not contain any language that *explicitly* forbids a state, acting like a general construction contractor, from entering into a prehire agreement. Rather, the majority believes that the Act *implicitly* forbids it from doing so, *i.e.*, that the Act implicitly removed, or pre-empted, a state's power to act as the MWRA has acted here. Applying general principles of pre-emption, the majority must therefore believe (1) that the MWRA's action "conflicts with" the Act, (2) that it "frustrate[s] the federal [statutory] scheme," or (3) that it appears "from the totality of the circumstances that Congress sought to occupy the field to the exclusion of the states." *Malone v. White Motor Corp.*, 435 U.S. 497, 504 [98 S.Ct. 1185, 1190, 55 L.Ed.2d 443] (1978) (setting forth general conditions for pre-emption); *see also Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 300 [108 S.Ct. 1145, 1148, 99 L.Ed.2d 316] (1988). We do not see how permitting a state agency, when acting like a general contractor, to make labor agreements just like those that private general contractors make, could "conflict with" the NLRA, "frustrate" the NLRA "scheme," or otherwise interfere with the regulatory system that the NLRA creates.

*Id.*, 935 F.2d at 360 (Breyer, C.J., & Campbell, J., dissenting) (emphasis in original).

Neither the Act nor the legislative history supports the view that Congress intended that construction industry prehire contracts would be valid only in the private sector. Moreover, "the reasons Congress gave for authorizing [prehire contracts] have nothing to do with the public or the private nature of the employer." *Id.*, 935 F.2d at 364. As the First Circuit dissenters noted:

> Further, to permit private general contractors, but not states, to enter into construction-industry prehire agreements would likely produce an odd crazy-quilt of prehire practices. Whether one finds such an agreement would often reflect, not size of the project, or desire of the parties, or special conditions of the industry, but simply whether or not the entity letting the contracts is an arm of the state or private....
>
> Finally, Congress had two perfectly good reasons for not making the construction-industry exceptions explicitly applicable to states, and neither of these reasons suggests any pre-emptive intent. First, the obvious reason is that the list of forbidden practices, to which the exceptions apply, itself applies only to an "employer," defined to exclude "any State," thereby leaving the regulation of labor relations between a state and its own employees primarily to state law. A drafter, writing a statutory exception to the resulting prohibition, would not normally extend its scope beyond those subject to the prohibition in the first place. Second, Congress, particularly when it enacted the construction-industry exceptions in 1959, had little reason to believe that a court might find, hidden in the silence of the Act, some other relevant prohibition applicable to a state.

*Id.*, 935 F.2d at 364.

Finally, in this case, as in *Associated Builders*, the city is, in reality, a buyer that competes with other private and public buyers. It is entitled to the protection of a prehire agreement for the same reason as other owners or general contractors: it wants to preserve peaceful working conditions to get the job done on time. Congress has decided that prehire contracts make for a level playing field, and we should not interfere with the decision of the city that it is in its best interest to have such contracts.

## IRREPARABLE INJURY

Even if the foregoing analysis is incorrect, Glenwood Bridge has an adequate legal remedy available to it in the form of damages and declaratory judgment. Accordingly, I believe it has failed to demonstrate the irreparable injury required by

*Dataphase* for the entry of a preliminary injunction. I agree with the majority that a bond in an amount sufficient to reimburse the City of Minneapolis for the losses it might incur because of the delay caused by the granting of the injunctive relief will adequately protect the city and the taxpayers of the city in the event the city prevails. I further agree that the district court is the appropriate court to determine the amount of the bond. The bond must be substantial to protect the interest of the city. The project has already been delayed by more than four months and will be further delayed while this matter winds its way through the federal courts. Moreover, the delays have already pushed the project into the winter construction season, which will significantly increase the cost of the project.

If Glenwood Bridge should ultimately prevail on the merits, the majority suggests that the appropriate remedy would be to rebid the project without a labor stabilization agreement. I agree that the bids submitted in February 1991 in the second round of bidding most likely have become stale. The new bids will certainly be higher than those received to date because of increased costs for materials and labor and because of higher winter construction costs. It is difficult to understand who benefits by requiring the project to be rebid. Certainly the taxpayers of the City of Minneapolis do not gain because they will have to pay the higher cost of constructing the bridge while enduring the inconvenience of a protracted delay in its completion.

The majority notes that a preliminary injunction, combined with success on the merits, would safeguard Glenwood Bridge's right to re-bid on this project without the labor stabilization agreement. I believe the majority errs, however, in concluding that money damages and declaratory relief will not fully vindicate this right. Money damages will place Glenwood Bridge in precisely the same financial position it would have occupied had the city not rejected all bids made in the initial round, which contained no labor stabilization agreement. A declaratory judgment will invalidate the labor stabilization agreement for purposes of future city construction projects, guaranteeing Glenwood Bridge's right to participate in a legal bidding process. Damages and declaratory relief thus would give Glenwood Bridge the economic benefit of its bargain with the city in the first round of bidding and a right to bid on future city projects free of labor stabilization agreements. The only possible further benefit to Glenwood Bridge of injunctive relief would be an opportunity to re-bid this project with no assurance whatever that it would actually submit the low bid and be awarded the contract. When balanced against the potential harm to the city and its taxpayers in terms of increased project costs and delays if an injunction is granted, I do not believe that Glenwood Bridge's lost opportunity to re-bid constitutes irreparable harm sufficient to support an injunction under *Dataphase*. Similarly, the public interest in a fair bidding process will be as well protected by a declaratory judgment as it would by injunctive relief. I therefore believe that Glenwood Bridge has failed to establish two prongs of the *Dataphase* test and is not entitled to injunctive relief. Accordingly, I would affirm the order of the district court.