ASSOCIATED BUILDERS AND CONTRACTORS, INC., et al., Plaintiffs–Appellants,

v.

CITY OF SEWARD, an Alaska own rule municipality; International Brotherhood of Electrical Workers, Local Union 1547 (IBEW), a labor union, Defendants–Appellees.

No. 91–35511.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 7, 1992.

Decided June 5, 1992.

Maurice Baskin, Venable, Baetjer, Howard & Civiletti, Washington, D.C., Stephen M. Ellis, Delaney, Wiles, Hayes, Reitman & Brubaker, Inc., Anchorage, Alaska, for plaintiffs-appellants.

Helene M. Antel, IBEW Local Union 1547, Anchorage, Alaska, for defendants-appellees.

Before WRIGHT, NORRIS, and HALL, Circuit Judges.

WILLIAM A. NORRIS, Circuit Judge:

The City of Seward ("Seward") owns and operates its own electric utility. Seward has a Collective Bargaining Agreement ("CBA") with the International Brotherhood of Electrical Workers ("IBEW"). In 1990, Seward received a grant from the Alaska legislature to replace an old high voltage electric transmission line. Although Seward has traditionally relied on its own employees to do the work on improvements in its electrical system, in this case it decided to contract out the transmission line renovation project to a private contractor. The primary reason for doing so was that Seward lacked the heavy construction equipment needed to do the job.

To protect the interests of the Seward employees represented by the IBEW, the union negotiated with Seward to add a work preservation clause to the CBA. The clause limits bidding on the renovation project to contractors who agree to enter into a labor agreement with the IBEW for purposes of this project.[1]

---

1. The work preservation clause reads as follows:
    The City of Seward ("the Employer") agrees that, to the extent permitted by law, (including 29 U.S.C. § 158(e)), it will not contract for or allow the subcontract for the construction of the 115 kv main electrical transmission intertie line between Lawing and Fort. Raymond [substations] for work traditionally performed by employees represented by the International Brotherhood of Electrical Work-

Trade associations representing construction industry contractors ("Contractors") filed this action seeking to enjoin the enforcement of the work preservation clause. The Contractors maintained the clause is preempted by the National Labor Relations Act (NLRA), that it violates the antitrust laws, and that it operates to deny the Contractors equal protection and due process of law.

Ruling on stipulated facts, the district court granted summary judgment to Seward and the IBEW. The Contractors appeal. We review a summary judgment *de novo. See Harkins Amusement Enterprises, Inc. v. General Cinema Corp.*, 850 F.2d 477, 482 (9th Cir.1988), *cert. denied*, 488 U.S. 1019, 109 S.Ct. 817, 102 L.Ed.2d 806 (1989).

### I

We first address the Contractors' preemption argument that the NLRA prohibits Seward from enforcing the work preservation clause in its CBA with the IBEW.

In *Golden State Transit Corp. v. City of Los Angeles*, 475 U.S. 608, 106 S.Ct. 1395, 89 L.Ed.2d 616 (1986), the Supreme Court summarized its NLRA preemption case law. The Court said:

> Last Term, in *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724 [105 S.Ct. 2380, 85 L.Ed.2d 728] (1985), we again noted: "The Court has articulated two distinct NLRA preemption principles." The first, the so-called [*San Diego Building Trades Council v.*] *Garmon* [359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959)] preemption prohibits States from regulating "activity that the NLRA protects, prohibits, or arguably protects or prohibits." The *Garmon* rule is intended to preclude state interference with the National Labor Relation Board's interpretation and active enforcement of the "integrated scheme of regulation" established by the NLRA.

> [T]he second, ... the so-called *Machinists* [*v. Wisconsin Employment Relations Comm'n*, 427 U.S. 132, 96 S.Ct.

2548, 49 L.Ed.2d 396 (1976)] preemption ... precludes state and municipal regulation "concerning conduct that Congress intended to be unregulated." Although the labor-management relationship is structured by the NLRA, certain areas intentionally have been left " 'to be controlled by the free play of economic forces.' " The Court recognized in *Machinists* that ... Congress' decision to prohibit certain forms of economic pressure while leaving others unregulated represents an intentional balance " 'between the uncontrolled power of management and labor to further their respective interests.' "

*Id.* at 613–14, 106 S.Ct. at 1398–99 (citations omitted).

Citing *Golden State*, the Contractors argue that the work preservation clause in Seward's CBA triggers the so-called *Machinists* preemption principle which the Court found applicable in *Golden State*. In *Golden State*, the employees of a privately-owned taxi cab company were on strike when their employer's cab franchise came up for renewal by the City of Los Angeles. The city council refused to renew the franchise unless the cab company settled the strike by a certain date. The strike was not settled and the franchise expired. The cab company sued the city on the ground that the city's conditioning the renewal of the franchise on the settlement of the strike constituted an impermissible attempt to regulate conduct that Congress intended to be unregulated.

Invoking the *Machinists* preemption doctrine, the Supreme Court agreed. The Court said that the NLRA "leaves the bargaining process largely to the parties," *id.* at 616, 106 S.Ct. at 1400, and that "[t]he parties' resort to economic pressure [in this case] was a legitimate part of their collective-bargaining process." *Id.* at 615, 106 S.Ct. at 1399. The Court went on to observe that "the bargaining process was thwarted when the city in effect imposed a positive durational limit on the exercise of

ers, Local Union 1547 ("IBEW") except to a person, firm, or corporation that is a party to

an appropriate current labor agreement with IBEW.

economic self-help." *Id.* Because "[p]rotecting the free use of economic weapons during the course of negotiations was the rationale for [the] finding[ ] of preemption in *Machinists*," the Court held the city's action was preempted by the NLRA. *Id.* at 617, .106 S.Ct. at 1400.

Here, the Contractors argue that, just like the City of Los Angeles in *Golden State*, the City of Seward impermissibly regulated private sector collective bargaining when it enforced the terms of the work preservation clause against private contractors. In response, Seward and the IBEW argue that the Contractors overlook the critical fact that this case, unlike *Golden State,* involves action taken by a city in its capacity as a public employer to enforce the terms of a valid work preservation clause in a collective bargaining agreement that covers its own electrical employees. Relying in part on Congress' exemption of public sector collective bargaining from the coverage of the NLRA, *see* 29 U.S.C. § 152(2), Seward and the IBEW contend that the NLRA does not preempt the action Seward took in its capacity as a public employer.

### A

■ *Golden State* is clear authority for the proposition that a city may not regulate the collective bargaining activities of private employers merely because they do business *in* the city. In *Golden State,* the Supreme Court held that the NLRA barred the City of Los Angeles from using its power to franchise taxi cab companies to influence the bargaining process between a cab company and its employees. In that sense, the Contractors are correct that the City of Seward cannot use its regulatory power to influence private sector collective bargaining. In this case, however, Seward was not exercising its regulatory power, but rather was exercising its power as a market participant. Seward did not require all contractors doing business in the city to have a collective bargaining agreement with the IBEW; rather it only required the successful bidder on the city's power line renovation project to have such

a contract. This is an important distinction for the purpose of applying the NLRA preemption doctrine. As the Supreme Court has explained in the Commerce Clause context, "[w]hen the State acts solely as a market participant, no conflict between state *regulation* and federal regulatory authority can arise." *United Building and Construction Trades Council of Camden County v. City of Camden,* 465 U.S. 208, 220, 104 S.Ct. 1020, 1028, 79 L.Ed.2d 249 (1984) (emphasis in original).

The fact that Seward was acting as a market participant, however, does not end the preemption inquiry. In *Wisconsin Department of Industry, Labor and Human Relations v. Gould, Inc.,* 475 U.S. 282, 106 S.Ct. 1057, 89 L.Ed.2d 223 (1986), the Court recognized that in some circumstances state action as a market participant could run afoul of the NLRA.

In *Gould,* the Court considered whether the NLRA preempted a Wisconsin statute prohibiting state procurement agents from purchasing any products manufactured or sold by a company that repeatedly violated the NLRA. *Id.* at 283–84, 106 S.Ct. at 1059–60. In the course of its analysis, the Court rejected Wisconsin's argument that its procurement statute was not subject to preemption analysis because it constituted "an exercise of the State's spending power rather than its regulatory power." *Id.* at 287, 106 S.Ct. at 1061. The Court reasoned, "That seems to us a distinction without a difference, at least in this case, because on its face the debarment statute serves plainly as a means of enforcing the NLRA." *Id.*

■ *Gould* thus stands as authority for the idea that action taken by a state as a market participant is not automatically immune from NLRA preemption. In deciding that the Wisconsin procurement policy constituted an impermissible effort to use the state's purchasing power to regulate private sector labor relations, the Court in *Gould* looked to the state's purpose in adopting the policy. The Court specifically relied both on the state's concession "that the point of the statute is to deter labor law violations and to reward 'fidelity to the

law,'" *id.,* and on its own observation that "[n]o other purpose could credibly be ascribed [to the statute.]" *Id.* Because the Wisconsin policy served the sole purpose of enforcing the NLRA, the Court determined that "for all practical purposes, Wisconsin's debarment scheme is tantamount to regulation," *id.* at 289, 106 S.Ct. at 1062, and hence subject to NLRA preemption analysis.

In *Gould,* the Court went on to limit the reach of its holding that the Wisconsin procurement policy was an impermissible attempt to regulate private sector labor relations: "We do not say that state purchasing decisions may never be influenced by labor considerations, any more than the NLRA prevents state regulatory power from ever touching on matters of industrial relations." *Id.* at 291, 106 S.Ct. at 1063. It added, "We are not faced here with a statute that can even plausibly be defended as a legitimate response to state procurement constraints or to local economic needs, or with a law that pursues a task Congress intended to leave to the States." *Id.*

### B

■ In this case, the City of Seward acted as a market participant when it required the winning bidder on its power line renovation project to comply with the terms of the work preservation clause in the city's collective bargaining contract with the IBEW. In deciding whether Seward's action constituted an impermissible effort to use its market power to regulate private sector labor relations, we focus our inquiry on the question whether the work preservation clause had the sole purpose of regulating conduct that Congress intended to be unregulated or whether "[an]other purpose could credibly be ascribed [to the union signatory requirement.]" *Gould,* 475 U.S. at 287, 106 S.Ct. at 1061–62.

In our view, there is no reason to believe that the work preservation clause was motivated by labor regulatory goals. Seward's purpose in agreeing to the work preservation clause was not to regulate the labor relations of its contractors. As far as the record indicates, Seward's sole purpose was to ensure harmonious industrial relations with its own electrical workers, who had traditionally performed the renovation work, since in this instance the city had to contract out the work because it did not have the necessary equipment to do the job. To be sure, the work preservation clause obligated the city to require the successful bidder to have a collective bargaining agreement with the IBEW covering this project. But the terms of the work preservation clause in the City's CBA with the IBEW were hammered out in the collective bargaining process. Like any work preservation clause, it was designed to provide a measure of economic protection for the employees of the City's electrical utility.

On the face of it, the City of Seward, unlike the State of Wisconsin in *Gould* or the City of Los Angeles in *Golden State,* was not driven by regulatory concerns, but by legitimate management concerns that may lead any employer, public or private, to agree to a work preservation clause: striking a bargain with a union that represents its employees, maintaining harmonious relations with that union and its members, and avoiding industrial unrest in conducting its business affairs. Indeed, work preservation clauses such as the one at issue here are common in private sector collective bargaining agreements. *See, e.g., CCH, Union Contract Clauses* § 51,-806.42, at 747.[2]

We now turn to the question whether Congress intended to prohibit a public employer from requiring one of its contractors to have an agreement with the union that represents the public employers' employees who have traditionally performed the work being contracted out. We believe this question poses no difficulty because Congress has expressly placed public sector labor relations beyond the reach of the NLRA, and "Congressional purpose is of course 'the ultimate touchstone' of preemption analysis." *Gould,* 475 U.S. at 290, 106

---

**2.** The Contractors do not dispute that the clause pursuant to which Seward acted would be a valid work preservation agreement if entered into by a private employer.

S.Ct. at 1063 (citations omitted). Congressional purpose vis-a-vis public employers is expressed in section 2(2) of the NLRA. That section exempts public employers from the definition of "employer" and consequently from the coverage of the Act. *See* 29 U.S.C. § 152(2) ("When used in this subchapter ... [t]he term 'employer' ... shall not include ... any state or political subdivision thereof.") ("section 2(2)"); *see also Abood v. Detroit Board of Education*, 431 U.S. 209, 223, 97 S.Ct. 1782, 1793, 52 L.Ed.2d 261 (1977) ("The National Labor Relations Act leaves regulation of the labor relations of state and local governments to the States."). In light of section 2(2), we fail to see how Congress could have intended to prohibit a public employee from agreeing to a work preservation clause to which a private employer is free to agree.

The Contractors rely heavily on *Associated Builders and Contractors of Massachusetts/Rhode Island, Inc. v. Massachusetts Water Resources Authority*, 935 F.2d 345 (1st Cir.1991) (en banc), *cert. granted,* — U.S. —, 112 S.Ct. 293, 116 L.Ed.2d 238 (1992) [hereinafter *"Boston Harbor"*]. In *Boston Harbor*, the First Circuit held that the NLRA preempted an attempt by the Massachusetts Water Resources Authority ("MWRA") to limit the bidding on the multi-billion dollar Boston Harbor clean-up project to contractors who agreed to sign a master collective bargaining agreement (drafted on behalf of the MWRA) with the Construction Trades Council and affiliated labor organizations. The Contractors argue that deciding this case in favor of Seward would conflict with *Boston Harbor.*

*Boston Harbor* does indeed share certain similarities with this case. In *Boston Harbor,* just as here, the state entity had a preexisting collective bargaining agreement with a union which required that all work done on a public project be awarded to contractors and subcontractors who agreed to sign a collective bargaining agreement with that union. The Contractors, however, overlook a crucial distinction between *Boston Harbor* and this case. The MWRA in *Boston Harbor* did not act out of its concerns as a public employer; unlike the City of Seward, it did not employ workers who had traditionally performed the work that would be contracted out.[3] Thus, the purpose of the union signatory requirement in *Boston Harbor* was not to preserve work traditionally performed by city employees. Here, by contrast, Seward is a public employer that has a collective bargaining agreement with the union representing its utility's electrical employees and the CBA defines the relevant bargaining unit broadly enough to cover the power line renovation work.[4] The union signatory requirement has been imposed to preserve work traditionally performed by members of the bargaining unit.

3. *Glenwood Bridge, Inc. v. City of Minneapolis*, 940 F.2d 367, 370 (8th Cir.1991), a case which followed *Boston Harbor,* is distinguishable for the same reason. The City of Minneapolis was not acting as a public employer since it did not own a public company and employ workers who traditionally performed the type of work at issue. Rather, Minneapolis, like the MWRA, was placed in charge of a project that required the *hiring* of workers, and in order to ensure smooth labor relations, it entered into a stability agreement with a specific union.

Because *Boston Harbor* and *Glenwood Bridge* are distinguishable, we need not take a position on the merits of those cases. *Boston Harbor* was decided by an *en banc* panel of the First Circuit that split 3–2; the *Glenwood Bridge* panel split 2–1. A petition for certiorari in *Boston Harbor* is currently pending before the Supreme Court.

4. The work preservation clause did not extend beyond the bargaining unit. *See Letter of Agreement Relating to Seward Inertie Project* ("[T]his provision is designed and intended to preserve work traditionally performed by employees represented by IBEW whose wages, hours, and conditions of employment are prescribed by this Agreement."). The stipulated facts show that Seward's own employees who are represented by the IBEW have done the work on major improvements to Seward's electrical system, including at least twenty different electrical transmission line projects in recent years. The stipulated facts also show that the renovation of the power line is directly related to the work done by Seward's employees, that is, the *maintenance* of the power line. It is not disputed that if Seward had had the heavy equipment necessary to undertake the project, it would have used its own utility employees to do the work.

As we have already noted, the fact that Seward acted in this case in its capacity as a public employer is crucial to the preemption analysis. Indeed, *Boston Harbor* itself makes clear that NLRA preemption principles do not apply to an action by state or local government acting out of concerns it may have as a public employer. *Id.* at 354 ("Of course, if the MWRA were the actual employer of the Project laborers, the NLRA would be totally inapplicable as States are excluded from the definition of 'employer.'"). The fact that Seward will not be the actual employer of the workers on the line renovation project is irrelevant, so long as Seward acted in its capacity as a public employer in enforcing the terms of a valid work preservation clause in its CBA with the IBEW.

Were we to interpret the NLRA as prohibiting a municipality from fulfilling its obligations as a public employer under an otherwise valid work preservation clause in a public sector collective bargaining agreement, we would be paradoxically attributing to Congress the intent to impose more stringent labor regulations on public employers than on private employers. Such an interpretation of the NLRA would be at odds with Congress' command in section 2(2) that public sector labor relations be left unregulated by the federal government. It would indeed transform the preemption case law into a round-about way of redacting, at least partially, section 2(2) of the NLRA.

In sum, we see no basis for attributing to Congress an intent to prohibit a public employer from using a work preservation clause as a bargaining chip in the collective bargaining process while allowing a private employer to do just that. Because Congress exempted public sector collective bargaining from the scope of the NLRA, we believe the decision whether to agree to and enforce a work preservation clause is "a task Congress intended to leave to the States." *Gould,* 475 U.S. at 291, 106 S.Ct. at 1064. Accordingly, we hold that the NLRA does not preempt the City of Seward's actions requiring the successful bidder to have an agreement with the IBEW because the requirement was imposed pursuant to a valid work preservation clause in a collective bargaining agreement covering the city's electrical employees.

## II

The Contractors' second claim is that Seward's CBA with the IBEW violates the Sherman Antitrust Act, which broadly proscribes "every contract, combination in the form of trust or otherwise, in restraint of trade or commerce." 15 U.S.C. § 1. The Contractors rely on cases which prohibit agreements between unions and nonlabor organizations designed to reduce competition. *See, e.g., Connell Construction Co. v. Plumbers & Steamfitters Local Union No. 100,* 421 U.S. 616, 622, 95 S.Ct. 1830, 1835, 44 L.Ed.2d 418 (1975). The Contractors' reliance on these cases is misplaced because the Supreme Court has recognized a non-statutory exemption from antitrust liability for collective bargaining agreements. *Id.*

Relying on *Sun–Land Nurseries v. Southern California District Council of Laborers,* 793 F.2d 1110 (9th Cir.1986) (en banc), *cert. denied,* 479 U.S. 1090, 107 S.Ct. 1299, 94 L.Ed.2d 155 (1987), Seward and the IBEW argue that a work preservation clause comes within the ambit of the nonstatutory exemption to antitrust liability. In *Sun–Land,* we considered the applicability of the non-statutory exemption to construction industry collective bargaining agreements requiring subcontractors to be parties to a collective bargaining agreement with the union. Noting that Section 8(e) of the NLRA permits "hot cargo" agreements in the construction industry, we held that "a valid subcontracting clause contained in a collective bargaining agreement cannot serve as the basis for an antitrust claim" because "Congress would not have exempted the construction industry from the prohibition against 'hot cargo' clauses only to have such provisions create liability under antitrust laws." *Id.* at 1117. We recognize that, since the City of Seward is not an employer under section 2(2), neither the general prohibition against hot cargo agreements nor the exemption in section 8(e) applies to it. Nonetheless, we find

the reasoning in *Sun–Land* persuasive. Just as the employer and the union in *Sun–Land,* the City of Seward and the IBEW entered into an agreement permitted by law. It would be inconsistent to approve such an agreement under labor law, but strike it down under antitrust law. Accordingly, we hold that the Seward work preservation clause is immune from antitrust liability.[5]

### III

■ The Contractors further argue that Seward's enforcement of the terms of the work preservation clause violates the Equal Protection Clause of the Fourteenth Amendment because it constitutes state action favoring union contractors over non-union contractors. They then argue that the discrimination between these two groups is constitutionally infirm because it fails minimum rationality. We reject this argument. It is just as rational for a public employer to favor union contractors pursuant to a work preservation clause as it is for a private employer to do so. *See, e.g., Image Carrier Corp. v. Beame,* 567 F.2d 1197, 1203 (2nd Cir.1977) (holding that rational basis exists for city policy favoring union printers over non-union printers), *cert. denied,* 440 U.S. 979, 99 S.Ct. 1785, 60 L.Ed.2d 239 (1979).

### IV

■ Finally, the Contractors argue that the City of Seward denied them due process of law when it agreed with the IBEW to add the work preservation clause to the CBA without giving the Contractors notice and an opportunity to be heard. This argument fails because as wishful bidders the Contractors have no constitutionally protected property interest in the city's power line renovation project. *See Eastway Construction Corp. v. City of New York,* 762 F.2d 243, 250 (2nd Cir.1985) (the abstract need or desire to participate in public construction contracts does not constitute a property right protected by the Fourteenth Amendment).

The summary judgment in favor of appellees is AFFIRMED.

EUGENE A. WRIGHT, Circuit Judge, dissenting:

With due respect to the views of my colleagues, I must dissent.

Although the majority's opinion is soundly reasoned, it rests on a faulty premise: that the City of Seward acted as a public employer when it conditioned bidding on its electrical project to those contractors who agreed to be union signatories. If it was acting as a public employer, it would be unnecessary to address the appellants' preemption argument. If the City actually employed the contractors' laborers, the NLRA would simply not apply because States are excluded from the NLRA's definition of employer. 29 U.S.C. § 152(2); *see also Associated Builders and Contractors of Massachusetts/Rhode Island, Inc. v. Massachusetts Water Resources Authority,* 935 F.2d 345, 354 (1st Cir.1991) (en banc), *cert. granted,* —— U.S. ——, 112 S.Ct. 293, 116 L.Ed.2d 238 (1992) [*Boston Harbor*].

As in *Boston Harbor,* indicia of an employer/employee relationship between the City and the contractors' laborers are not present here.[1] Not surprisingly, neither

---

**5.** In the alternative, the City and the IBEW argue that the summary judgment on the antitrust claim can be affirmed on the basis of the governmental action exception to the Sherman Act. We need not reach this argument.

**1.** In deciding that insufficient indicia of an employment relationship existed in *Boston Harbor,* the court considered the facts establishing whether an independent contracting relationship existed between the MWRA and its employees. It found that under the standard for determining independent contractor status, the relationship between the construction workers and the MWRA was a contractual, not an employment, relationship. It reached this conclusion by finding that the MWRA did not have the right to control the laborers' performance, nor did it pay their salaries, provide pension or other benefits, or make FICA payments on their behalf. *Id.* at 355, n. 17.

Here, the parties did not have opportunity to explore the relationship between the City of Seward and its own employees to the extent that the *Boston Harbor* parties did. Because the majority fails to provide any evidence that the

side in our case even argues that the City had an employment relationship with the laborers. Despite this lack of evidence, the majority maintains that, because the City's actions were motivated by its desire to maintain a harmonious relationship with its own employees, it may regulate the labor relations of other employers.[2] This can not be.

As the *Boston Harbor* court noted:

If the state employer exclusion from the NLRA were interpreted to include all situations in which a state contracted for goods or services, the exception would likely swallow up the rule.

*Id.* at 355. To allow the City to engage in regulation of other employers' labor relations would displace the NLRA. Taken to the extreme, the majority's state-as-employer argument could result in an anti-union state government permitting ,only non-union employers to bid on state projects. *See id.* Moreover, the majority's focus on the City's intent in adopting the work preservation clause would force the federal courts into an evaluation of local government motives, a seemingly impossible task and one which we have traditionally avoided. In short, when a State acts as a public employer, it should be bound to confine its regulatory function to its own current and future employees.

That a private employer could agree to a work preservation clause does not help the City here. Although the majority suggests that the rules are the same for public and private employers, the statute suggests otherwise. The *Boston Harbor* court explicitly rejected the appellees' argument that because the MWRA's action would be lawful under NLRA §§ 8(e) and (f) if the MWRA were a private employer, "there is no basis under the NLRA to treat a state

more harshly than a comparably situated private party." *Id.* at 358.

The court declared that Congress is "perfectly capable of distinguishing between states and private parties" as it has done in sections 8(e) and (f). *Id.* In *Wisconsin Dept. of Indus. v. Gould*, 475 U.S. 282, 290, 106 S.Ct. 1057, 1063, 89 L.Ed.2d 223 (1986), the Court explained why it is important to treat public and private employers differently:

[G]overnment occupies· a unique position of power in our society, and its conduct, regardless of form, is rightly subject to special restraints.... The Act [NLRA] treats state action differently from private action not merely because they frequently take different forms, but also because in our system States simply are different from private parties and have a different role to play.

The *Boston Harbor* court concluded that "it is plain that the private employer comparison merits little weight. The MWRA is an arm of the state, and its acts must be judged accordingly." *Boston Harbor*, 935 F.2d at 358.

The majority finds no support in sections 8(e) or (f) either. Those sections, which allow pre-hire agreements in the construction industry for private employers, are deafeningly silent as to permitted state regulation. *See Glenwood Bridge, Inc. v. City of Minneapolis*, 940 F.2d 367, 371 (8th Cir.1991) (holding that Sections 8(e) and (f) do not grant public employers the ability to enter into pre-hire agreements). In enacting the two sections, Congress occupied the field to the exclusion of local regulations such as Specification 13.1 in *Boston Harbor*[3] and the work preservation clause here. *See Boston Harbor*, 935 F.2d at 357.

---

City acted as an employer here, it is hard to accept the conclusion that it did.

**2.** Under normal circumstances, employers may not enter into pre-hire agreements. Congress made an exception for private employers in the construction industry. To allow a state entity, which cannot be an employer under the NLRA, to be considered an employer for purposes of *this exception is* "fancy judicial foot work at its nimblest." *Id.*

**3.** Specification 13.1 in *Boston Harbor*, like the work preservation clause between the City and the IBEW, limited bidding on the MWRA's project to those contractors who agreed to hire only union laborers. The *Boston Harbor* court found that the NLRA preempted Specification 13.1 because it directly regulated the bargaining process. The court stated, "where interference into the collective bargaining process by the state is *direct*, an asserted state interest of the type at issue here, whether 'proprietary' or otherwise, cannot justify the interference." *Id.* at

Were the City the employer, I would have little trouble agreeing with the majority's conclusions. I fail to see how the City's relationship with its own employees justifies its intrusion into the labor relationships between prospective contractors and their employees. I respectfully dissent.

359. As in *Boston Harbor*, our inquiry should focus on whether the City's action has the effect of regulating the collective bargaining process, rather than on what the City's motives were in agreeing to a work preservation clause.